IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 7, 2013 Session

# JOHN RIAD v. ERIE INSURANCE EXCHANGE

**Appeal from the Circuit Court for Bradley County**
**No. V11558    Hon. J. Michael Sharp, Judge**

---

**No. E2013-00288-COA-R3-CV-FILED-OCTOBER 31, 2013**

---

This case concerns Erie's refusal to pay insurance proceeds to Plaintiff, who filed suit, alleging claims of breach of contract, bad faith refusal to pay, and violations of the Tennessee Consumer Protection Act, codified at Tennessee Code Annotated section 47-18-101, et. seq. The case proceeded to jury trial. After denying a myriad of motions and reopening the proof to admit the insurance policy into evidence, the trial court submitted the case to the jury. The jury awarded Plaintiff compensatory and punitive damages and found that Erie's failure to pay was in bad faith and in violation of the Tennessee Consumer Protection Act. The court assessed the statutory bad faith penalty and awarded treble damages and attorney fees. Erie appeals. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and THOMAS R. FRIERSON, II, J., joined.

Suzanne S. Cook, Johnson City, Tennessee, and S. Morris Hadden, Kingsport, Tennessee, for the appellant, Erie Insurance Exchange.

Joshua H. Jenne, Cleveland, Tennessee, for the appellee, John Riad.

## OPINION

## I. BACKGROUND

On July 24, 2007, John Riad ("Plaintiff") purchased three apartment buildings (collectively "the Property") in Cleveland, Tennessee for $540,000. He financed $525,000

of the purchase price with First National Bank and obtained an insurance policy with the help of Todd Walker of McIntire and Associates ("McIntire"). Mr. Walker, a statutory agent of Erie Insurance Exchange ("Erie"), insured the property through Erie. On June 8, 2009, Plaintiff sold the Property to Harry and Fern Perry (collectively "the Perrys") for $672,000. Plaintiff financed the Property even though he remained indebted to First National Bank. The Perrys submitted an insurance application through McIntire and ultimately received an insurance policy ("the Policy") from Erie. The Policy designated First National Bank as the first mortgagee on the Property but made no mention of Plaintiff. Upon Mr. Walker's discovery that Plaintiff had not been included in the Policy, Mr. Walker contacted Erie and requested that Plaintiff be added to the Policy to protect Plaintiff's interest.

On November 4, 2009, Plaintiff discovered that the Property had been damaged by vandalism and that a number of appliances and air conditioning units had been stolen. He reported the damage and theft to law enforcement and Mr. Walker, who submitted an insurance claim on his behalf. The claim remained unpaid when Plaintiff filed suit against Erie on August 3, 2011.[1] Plaintiff alleged that Erie breached its contract, that the breach was in bad faith, and that Erie violated the Tennessee Consumer Protection Act ("TCPA"). Plaintiff sought recovery of a bad faith penalty, attorney fees, and compensatory, punitive, and treble damages.

The case proceeded to a jury trial at which several witnesses testified. Mr. Walker testified that Erie was one of several insurance companies that he dealt with on a regular basis. He clarified that he was acting as an agent for Erie in this case, that he was not responsible for writing policies or making policy determinations, and that he merely assisted clients in submitting applications, which were either accepted or denied by Erie. He recalled that Plaintiff initially approached him about insuring the Property in 2007. He stated that he assisted Plaintiff in securing the initial policy from Erie and that he later assisted Plaintiff in attempting to become an additional insured on a second policy after the Property was sold to the Perrys.

Mr. Walker testified that prior to the sale of the Property in June 2009, Plaintiff had not submitted any claims for damage, loss or theft, or vandalism. He said that while he had never met the Perrys, his agency secured the Policy for them through Erie. He explained that his assistant submitted the insurance application for the Perrys because he was out of the office at the time. He stated that he visually inspected the Property and found improvements that led him to believe that the Property was in "better condition" than in 2007. He admitted that his visual inspection of the Property did not include an inspection of the interior of the

---

[1]Plaintiff also filed suit against McIntire. The jury effectively dismissed the complaint against McIntire by not assessing fault against McIntire. Plaintiff did not appeal the jury's decision.

apartments. Nevertheless, he reported to Erie that the Property was in an insurable condition. Erie ultimately approved the application and issued the Policy to the Perrys.

Mr. Walker testified that when First National Bank informed him that Plaintiff had financed the Property for the Perrys, he contacted Erie and requested "whatever coverage was necessary to protect [Plaintiff's] financial interest in the [P]roperty." He claimed that Erie advised him to submit an application requesting that Plaintiff be named an "additional insured." He opined that while he was free to suggest the type of policy that Plaintiff needed, Erie was ultimately responsible for deciding how to insure Plaintiff. He identified the submitted form, dated September 23, 2009, which provided,

> I need to add an additional insured to policy as the previous owner is doing [o]wner financing. I need to add it to both 4th Street locations.

He conceded that in requesting coverage for Plaintiff, he neglected to include one of the three buildings that comprised the Property. He insisted that he did not intend to exclude one of the buildings from coverage. He stated that First National Bank was listed as the mortgagee for the Property because it retained a financial interest in the Property.

Mr. Walker decried Erie's delayed response to Plaintiff's claim and testified that First National Bank even submitted a letter in an effort to support Plaintiff's interest. The letter, dated August 12, 2010, provided, in pertinent part,

> I have recently come to understand that the property pledged to First National Bank to secure a loan extended to [Plaintiff] has been adversely affected by the unfortunate acts of theft and vandalism. This property is located at [].

> I further understand that [Erie] has delayed the process of paying a legitimate claim to our mutual customer that was filed in an effort to return the subject property to its original condition.

> Please be advised that First National Bank would like to engage in whatever process necessary to support the claim filed by [Plaintiff], or if necessary, enter into a separate claim in an effort to have the property pledged to the bank reconditioned.

> Also at issue is the fact that [Plaintiff] has had diminished rental income due to [Erie's] prolonged delay in the payment of the filed claim. I would like to know if this loss of revenue is covered under the terms of the policy, as the diminished revenues are a concern to both First National Bank and our client.

-3-

I would like these "lost rents" included in the claim for the benefit of [Plaintiff].

He stated that his office forwarded the letter to Erie's claims adjuster, Clint Quarles. He opined that in pursuing the claim on Plaintiff's behalf, Erie provided conflicting information and often failed to return telephone calls and other correspondence. He identified a document, dated June 4, 2010, in which he warned Erie that Plaintiff's attorney expressed interest in filing a civil suit and pursing a bad faith claim. He claimed that he had never seen an insurance company delay a claim for as long as Erie had delayed Plaintiff's claim. He conceded that he was not privy to Erie's actual investigation and that Erie had, at the very least, conducted an examination in April 2010.

Clarence Martin testified that he had worked as an appraiser, a licensed contractor, and a real estate agent. He sold the Property to Plaintiff in 2007, assisted Plaintiff in managing the Property and collecting rent, and subsequently assisted Plaintiff in selling the Property to the Perrys. He claimed that the Property was "looking good" and that only 3 of the 24 units were vacant when the Perrys purchased the Property. He recalled that he accompanied the Perrys as they inspected "at least" nine of the apartments before closing. He insisted that "anything that needed fixed was fixed" and that the units were in an "average condition" and clean even though they were "older." He related that after the sale, Plaintiff even repaired a unit that had sustained water damage. He stated that other than the water damage, the Perrys never reported any other problems with their purchase.

Mr. Martin testified that he and Plaintiff found "a lot of damage" when they returned to the Property. He assessed the cost to repair the damage and missing items to be approximately $92,600. He could not remember how many units were in rentable condition, but he claimed that at least 18 of the units needed new carpet.

Mr. Quarles testified that he had worked for Erie as an insurance adjuster for approximately ten years. He explained that as an adjuster, his role was limited to determining whether a claim was covered by a particular policy. He insisted that he never made determinations as to whether a particular person should be covered by a policy. He stated that he was the adjuster assigned to Plaintiff's claim, which was submitted in December 2009. He recalled that shortly after the claim was filed, he sent a letter to the Perrys and Plaintiff in which he claimed that his documents reflected that Plaintiff was an "additional insured and mortgagee" on only two of the three buildings. He claimed that he mistakenly identified Plaintiff as a mortgagee. He identified a second letter, dated February 1, 2010, in which he informed Plaintiff that his records reflected that Plaintiff was actually "an additional insured on [two of the buildings] for liability purposes only." He explained that property loss such as theft or vandalism would not be covered for someone who only held

liability coverage. He could not recall whether he spoke with Mr. Walker about Plaintiff's coverage but admitted that Mr. Walker might have had trouble contacting him because he was "hard to reach sometimes."

Mr. Quarles testified that in June 2009, the Property had been valued at $835,526 for insurance purposes. He identified the declarations page of the Policy and conceded that the Policy provided for coverage in the amount of $1,000,000 and that the insurance premium for that coverage was $2,675 per year. He acknowledged that the Perrys were covered for losses due to theft and vandalism. He agreed that he had visited the Property and found that losses due to theft and vandalism had occurred and that the Perrys never filed a claim even though they were "named insureds" on the Policy. He related that according to his investigation, he believed that the damage to the Property was of the type that should be covered under the Policy. He asserted that Erie would not honor the claim because he was unable to determine when the damage occurred. He explained that Erie was not obligated to fulfill any claim if the damage had not occurred during the Policy period. He acknowledged that Erie still had not issued a formal denial letter but insisted that the claim had not been fulfilled and would not be fulfilled. He acknowledged that Plaintiff had previously insured the Property through Erie prior to his sale of the Property to the Perrys.

Matthew Jenne,[2] the Senior Vice President of First National Bank, testified that his primary responsibility was to assist in commercial lending. He related that he had known Plaintiff for a number of years in a professional and personal capacity. He stated that Plaintiff had "always [been] very truthful and very honest" and had "provided whatever information or documentation was required in managing his [professional] relationship" with First National Bank. He recalled that he extended a credit of $525,000 to Plaintiff in 2007 to purchase the Property, which had an appraisal value of $625,000. He stated that Plaintiff's subsequent sale of the Property to the Perrys did not affect the status of the loan. He stated that he became concerned when he first learned of the property damage in Spring 2010. He related that Plaintiff continued to submit timely mortgage payments and that First National Bank had submitted a letter concerning Plaintiff's claim for recovery. He claimed that at first, he was advised not to submit an additional claim on behalf of First National Bank but that he was eventually told that he needed to file a separate claim.

Mr. Jenne testified that as a result of Erie's delay in submitting payment on Plaintiff's claim, First National Bank was required to issue "force-placed insurance" on the Property for $6,300 per year and assess additional expenses relating to the management of the account. He acknowledged that if Erie submitted payment on Plaintiff's claim, First National Bank's

_____

[2]Matthew Jenne and Joshua Jenne, Plaintiff's counsel, are brothers.

interest would also be protected as a first mortgagee. He admitted that if Erie determined that the damage occurred prior to the sale, he could also submit a claim under the prior policy.

Shawn Zajac-Woodie, a property subrogation claims analyst, testified that he had worked for Erie since 1999. He identified an underwriting document, which provided that in June 2010, Erie had "[a]greed to backdate endorsement adding [Plaintiff] as mortgagee." He acknowledged that the same document provided that in October 2010, Erie reversed its earlier decision and decided not to backdate the endorsement. He claimed that he was not privy to the discussions regarding the decision to reverse the backdating of the endorsement and that he did not have any information concerning the reasoning for that decision.

Plaintiff testified that after his initial purchase of the Property, he invested approximately $30,000 in his renovation of the units and attempted to facilitate a "community feeling." He partnered with Lee University's Inner City Ministries and allowed college students to visit with tenants and provide food on Saturdays. He related that he generally collected rent each week and that he had a "personal relationship" with each tenant because he engaged them in conversation. He claimed that he was able to view the exterior and interior of the units on a regular basis because tenants often invited him inside the units.

Plaintiff testified that when he sold the Property, only a few of the 24 units were vacant because it was "the height of the season." He explained that the buildings were generally occupied in Spring because construction workers and landscapers knew of his reputation for providing clean apartments. He stated that he ultimately decided to sell the Property because he wanted to spend time with his family. He believed that the Property was ready to sell and insisted that the units had not been damaged prior to the sale. He explained that if he had noticed any damage, he would have simply filed an insurance claim prior to the sale. He admitted that he repaired one unit after the sale because it had sustained some water damage. He insisted that he did not know of the damage prior to the sale.

Plaintiff testified that he referred the Perrys to Mr. Walker to obtain insurance and that he inquired of Mr. Walker about protecting his interests as the financer of the Property. He stated that other than receiving payments, he did not have any further involvement with the Property following the sale. He claimed that he learned of the damage after the Perrys foreclosed on the Property and that he promptly called Mr. Walker to report the damage and request assistance in filing a claim. He related that he provided whatever documentation that Erie requested but that he had still not recouped payment on his claim. He opined that as a result of the delay, he had lost rent in the amount of $9,500 per month and incurred significant litigation expenses. He claimed that the units were in such a deplorable condition that he was unable to rent 20 of the 24 units when he first regained possession. He conceded that he did not have documentation to establish the amount of rent he had regularly received

prior to the sale but claimed that he only received $2,500 per month after he regained possession of the Property. He asserted that he surrendered his laptop, which contained his ledger pertaining to rent, to the Perrys when he sold the Property.

Fern Perry testified that she had never met Plaintiff but that she and her husband, with the help of a realtor, purchased the Property. She recalled that they chose the Property because Plaintiff boasted a significant cash flow. She stated that she was only allowed to view 2 or 3 of the 24 units prior to completing the sale. She admitted that she visited the Property "a number of times" with her realtor prior to the sale and that she did not notice any damage to the exterior of the Property. She claimed that she noticed damage when she obtained possession of the Property from Plaintiff. She opined that the units were "old and worn out" and "needed to be redone." She stated that she obtained insurance on the Property following the sale and that she had never submitted a claim for damage.

Mrs. Perry testified that her daughter and grandson, William Johnson, attempted to manage the property and that while Mr. Johnson lived on the Property, windows were broken, thefts occurred, and tenants moved from apartment to apartment when they attempted to collect rent. She admitted that they even replaced some air conditioning units that had been stolen. She conceded that her grandson eventually moved out in October 2009 and essentially abandoned the Property until Plaintiff regained possession a few months later when she and Mr. Perry filed a bankruptcy petition.

Following the presentation of the above evidence, Erie moved for a directed verdict, arguing that Plaintiff failed to prove the existence of the contract at issue, namely the Policy; that Plaintiff's bad faith claim should be dismissed because he failed to provide the requisite notice, because he failed to provide any evidence of damages, and because he failed to prove his claim of bad faith; that Plaintiff could not recover on his TCPA claim because the complaint did not contain a specific allegation that Erie had engaged in unfair or deceptive actions; and that Plaintiff could not recover punitive damages or damages for loss of rent. The trial court disagreed, allowed Plaintiff to formally admit the Policy into evidence as a late-filed exhibit, and submitted the case to the jury. The jury found for Plaintiff and assessed punitive damages in the amount of $1,500,000 and compensatory damages in the amount of $343,430. The jury further found that Erie had violated the TCPA, that Erie acted in bad faith, and that Plaintiff suffered additional damages as a result of Erie's bad faith. Thereafter, the trial court assessed the bad faith penalty and awarded treble damages of $1,030,290, finding that Erie, "by and through its agents, acted knowingly as contemplated by [Tennessee Code Annotated section 47-18-109(a)(3)." The trial court also awarded additional attorney fees not accounted for in the bad faith penalty and directed Plaintiff to make an election of remedies between the treble damages and punitive damages awarded. This timely appeal followed the trial court's denial of all post-trial motions.

## II.  ISSUES

While Erie does not directly challenge the jury verdict, Erie asserts that numerous errors committed by the trial court necessitate a new trial.  We consolidate and restate the issues raised on appeal as follows:

A.  Whether Erie is entitled to a new trial because the trial court committed numerous errors relating to the admissibility of evidence.

B.  Whether the trial court erred in reopening the proof.

C.  Whether the trial court erred in allowing the jury to consider Plaintiff's claim that Erie violated the TCPA.

D.  Whether the trial court erred in allowing the jury to consider Plaintiff's claim that Erie's failure to pay was a result of bad faith.

E.  Whether the trial court erred in denying Erie's motion for directed verdict.

F.  Whether the trial court erred in setting the amount of damages.

G.  Whether the trial court erred in adopting Plaintiff's findings of fact.

## III.  DISCUSSION

### A.

Erie asserts that it is entitled to a new trial because the trial court committed numerous errors relating to the admissibility of evidence.  Plaintiff responds that the trial court did not err in its evidentiary decisions.  Rulings on admissibility of evidence are within a trial court's discretion.  *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999).  "A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'"  *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).  We review the decision of the trial court to determine:

(1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principle, and

(3) whether the trial court's decision is within the range of acceptable alternatives.

*White*, 21 S.W.3d at 223. Improper admission or exclusion of evidence requires a new trial if the outcome of the trial was affected. Tenn. R. App. P. 36(b); *White*, 21 S.W.3d at 222. If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative. *White*, 21 S.W.3d at 223.

Erie claims that the trial court erred in overruling its hearsay objection to Mr. Martin's testimony concerning statements made by Plaintiff. Mr. Martin testified that Plaintiff told him that he foreclosed on the Property because the Perrys stopped submitting payments. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is inadmissible in trial court proceedings unless it falls within one of the recognized exceptions to the hearsay rule. Tenn. R. Evid. 802; *Mitchell v. Archibald*, 971 S.W.2d 25, 28 (Tenn. Ct. App. 1998). The colloquy between the court and counsel reveals that the statements were not excluded by the hearsay rule because they were characterized as admissions by a party opponent. The Tennessee Rules of Civil Procedure do not exclude statements "offered *against* a party" that are "the party's own statement in either an individual or a representative capacity." Tenn. R. Evid. 803(1.2) (emphasis added). Here, the statements were not offered against Plaintiff but were offered to bolster Plaintiff's case. The statements should have been excluded as hearsay; however, we decline to grant a new trial based upon this error. The information was properly admitted through other witnesses, namely Mrs. Perry, who admitted that she filed bankruptcy and abandoned the Property. Accordingly, the trial court's error did not affect the outcome of the trial when the evidence was introduced through other avenues.

Erie claims that the trial court erred in excluding testimony from Mr. Quarles concerning Erie's reasoning for denying the claim. Through Mr. Quarles, Erie sought to admit statements made by the Perrys and Mr. Johnson and a letter, with attached photographs, written by Joni Best, the realtor who assisted the Perrys in their purchase of the Property. The statements and letter, which were excluded as hearsay, concerned the condition of the Property prior to and shortly after the sale. Erie claimed that the statements were admissible as non-hearsay statements because they were not offered to establish the truth of the matter asserted but were offered to provide reasoning as to why Erie denied the claim. The offered evidence should not have been excluded because it was relevant and admissible to establish Erie's good faith reasoning for denying the claim; however, we decline to grant a new trial based upon this error. The crux of the information sought to be introduced was that Erie denied the claim because it could not determine when the damage

occurred. Mr. Quarles testified repeatedly that the claim had not been fulfilled because his investigation did not reveal when the damage occurred. Likewise, Mrs. Perry testified that she discovered that the units were damaged shortly after she and Mr. Perry purchased the Property. Accordingly, the trial court's error did not affect the outcome of the trial when the evidence was introduced through other avenues.

Erie claims that the trial court erred in limiting testimony from Mrs. Perry concerning the condition of the Property. However, Mrs. Perry could not recall which units she had visited prior to her purchase of the Property and could not identify photographs taken of specific units. Rule 602 of the Tennessee Rules of Evidence provides, in pertinent part,

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony.

The trial court did not err in limiting Mrs. Perry's testimony to matters upon which she had personal knowledge. Erie also sought to introduce a letter written by Ms. Best through Mrs. Perry. This letter, when offered through Mrs. Perry, was hearsay and was properly excluded by the trial court. Tenn. R. Evid. 801(c). This issue is without merit.

Erie claims that the trial court erred in refusing to exclude from opening statements Plaintiff's reference to police department call logs that were never entered into evidence. Erie asserts that the delayed ruling allowed Plaintiff to imply that there was damage to the Property without having to introduce proof of the call logs. Regardless of any potential for error by the trial court in this ruling, the mention of the call logs in Plaintiff's opening statement did not affect the outcome of the trial. Opening statements are not evidence and cannot be characterized as such. *See generally Wilson v. Americare Sys. Inc.*, No. M2008-00419-COA-R3-CV, 2009 WL 890870, at *6 (Tenn. Ct. App. Mar.31, 2009) (providing that closing arguments are not evidence and cannot be considered as such). Moreover, Mrs. Perry admitted at trial that the Property had been vandalized throughout her grandson's tenure as manager of the Property. This issue is without merit.

Erie claims that the trial court erred in overruling its objection to the admissibility of the commercial valuation report because Mr. Quarles could not properly authenticate the document. A review of the record reveals that Mr. Quarles had sufficient knowledge to authenticate the document in question. This issue is without merit.

Erie claims that the trial court erred in overruling its objection to testimony concerning First National Bank's claim for damages. Testimony concerning Erie's interactions with

-10-

First National Bank in regard to Plaintiff's claim for damages and its interest in the Property was relevant and admissible. This issue is without merit.

Erie claims that the trial court erred in allowing testimony from Mr. Zajac-Woodie because he was not listed on either party's witness list and "was not prepared to be called as a witness." Erie objected to Mr. Quarles testifying as the corporation's designated representative but then sought to prohibit Mr. Zajac-Woodie, who was the corporation's designated representative, from testifying at trial. Mr. Zajac-Woodie was present at trial and appeared to possess sufficient personal knowledge of the information contained in his testimony. *See* Tenn. R. Evid. 602 (prohibiting testimony from witnesses who have no personal knowledge of the matter). This issue is without merit.

Erie claims that the trial court erred in overruling its objection to leading questions during Plaintiff's re-direct examination. Rule 611 of the Tennessee Rules of Civil Procedure provides, in pertinent part,

> The court shall exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel.

We refuse to disrupt the trial court's ruling on procedural objections and its general control of the presentation of evidence when the record before this court offers no legitimate reason to interfere. This issue is without merit.

Having found no evidentiary issues that would merit a new trial, we respectfully deny Erie's request to set aside the judgment and remand the case for a new trial.

B.

Erie asserts that the trial court erred in denying its motion for a directed verdict because Plaintiff failed to introduce the Policy into evidence. Erie likewise asserts that the trial court prejudicially erred by reopening the proof to allow Plaintiff to introduce the Policy into evidence for the jury's consideration. Plaintiff responds that the court did not err in reopening the proof given the confusion surrounding the issue. Plaintiff notes that he, like the trial court, believed that the policy jacket was the actual policy at issue in the case and that Erie was disingenuous in withholding the Policy from discovery and objecting to the eventual admission of the newly discovered document.

"Permitting additional proof, after a party has announced that proof is closed, is within the discretion of the trial court." *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 149 (Tenn. 1991) (citing *State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985)).

-11-

"[U]nless it appears that its action in that regard has permitted injustice, its exercise of discretion will not be disturbed on appeal." *Id.*

To say that this case was hotly contested would be a gross understatement. Nevertheless, Erie admitted in its answer to Plaintiff's complaint that it issued an insurance policy to the Perrys. The central issue of the case concerned whether and in what capacity Plaintiff had been added to the Policy. Erie sat idly by as Plaintiff's counsel referred to another document as the Policy and admittedly waited until the close of proof to bring the oversight to opposing counsel's attention. While there may have been confusion surrounding which document comprised the Policy, neither party questioned the existence of the Policy issued by Erie. Erie relied heavily on the contents of the Policy at trial. Erie even relies on the Policy in its appeal to this court. With these considerations in mind, we conclude that the trial court did not abuse its discretion in reopening the proof to allow the admission of an undisputed document that was repeatedly referred to throughout the trial.

C.

Erie asserts that the trial court erred in allowing the jury to consider the TCPA claim following the General Assembly's enactment of Tennessee Code Annotated section 56-8-113, which specifically prohibits private causes of action in cases involving insurance claims. Erie alternatively argues that Plaintiff failed to properly plead the TCPA claim. Plaintiff responds that section 56-8-113 was not applicable to him because his cause of action accrued well before April 29, 2011, the enactment date of section 56-8-113. Plaintiff further responds that his complaint was sufficient and that Erie waived review of any issue pertaining to the sufficiency of his complaint.

Section 56-8-113, which was enacted on April 29, 2011, by Chapter 130 of the Public Acts of 2011 at section 1, provides,

Notwithstanding any other law, title 50 and this title shall provide the *sole and exclusive statutory remedies and sanctions* applicable to an insurer, person, or entity licensed, permitted, or authorized to do business under this title for alleged breach of, or for alleged unfair or deceptive acts or practices in connection with, a contract of insurance as such term is defined in § 56-7-101(a). Nothing in this section shall be construed to eliminate or otherwise affect any:

(1) Remedy, cause of action, right to relief or sanction available under common law;

(2) Right to declaratory, injunctive or equitable relief, whether provided under title 29 or the Tennessee Rules of Civil Procedure; or

(3) Statutory remedy, cause of action, right to relief or sanction referenced in title 50 or this title.

(Emphasis added). Section 2 of that Public Act provides,

This act shall take effect upon becoming law, the public welfare requiring it, and shall apply to any cause of action accruing on or after such date.

This court has repeatedly held that a TCPA claim accrues when the unlawful act or practice is discovered, thereby making the discovery rule applicable to such actions. *Fortune v. Unum Life Ins. Co.*, 360 S.W.3d 390, 402 (Tenn. Ct. App. 2010) (quoting *Schmank v. Sonic Automotive Inc.*, No. E2007-01857-COA-R3-CV, 2008 WL 2078076, at *2 (Tenn. Ct. App. May 16, 2008)). In this case, Plaintiff was indisputably aware of sufficient facts prior to April 2011 that he had sustained injury or damages as a result of Erie's actions. *Id.* at 403. Accordingly, we conclude that Plaintiff's claim accrued prior to April 29, 2011, rendering section 56-8-113 inapplicable to his cause of action.

Relative to the alleged insufficiency of the complaint, Rule 8.05 of the Tennessee Rules of Civil Procedure provides,

Each averment of a pleading shall be simple, concise and direct. No technical forms of pleading or motions are required. Every pleading stating a claim or defense relying upon the violation of a statute shall, in a separate count or paragraph, either specifically refer to the statute or state all of the facts necessary to constitute such breach so that the other party can be duly apprised of the statutory violation charged. The substance of any ordinance or regulation relied upon for claim or defense shall be stated in a separate count or paragraph and the ordinance or regulation shall be clearly identified. The manner in which violation of any statute, ordinance or regulation is claimed shall be set forth.

"Although a complaint 'need not contain in minute detail the facts that give rise to the claim,' the complaint must at least 'contain allegations from which an inference may fairly be drawn that evidence on these material points will be introduced at trial.'" *Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 704 (Tenn. 2002) (quoting *Donaldson v. Donaldson*, 557 S.W.2d 60, 61 (Tenn. 1977)). Having reviewed the complaint, we conclude that Erie

was adequately apprised of the statute upon which Plaintiff relied and the manner in which Plaintiff believed Erie violated the statute. Tenn. R. Civ. P. 8.05. This issue is without merit.

## D.

Erie argues that the trial court erred in allowing the jury to consider Plaintiff's claim of bad faith when Plaintiff failed to prove that he made a formal demand for payment 60 days before filing suit. Plaintiff responds that he timely informed Mr. Walker, Erie's agent, of his intention to seek recovery for Erie's bad faith.

This court has held that before recovery pursuant to Tennessee Code Annotated section 56-7-105 is permitted a plaintiff must prove that

(1) the policy of insurance must, by its terms, have become due and payable, (2) a formal demand for payment must have been made, (3) the insured must have waited 60 days after making his demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days), and (4) the refusal to pay must not have been in good faith.

*Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986) (citing *Third Nat. Co. v. Thompson*, 191 S.W.2d 190 (Tenn. Ct. App. 1945); *De Rosset Hat Co. v. London Lancashire Fire Ins. Co.*, 183 S.W. 720 (Tenn. 1915); and *St. Paul Fire & Marine Ins. Co. v. Kirkpatrick*, 164 S.W. 1186 (Tenn. 1913)). "[D]elay in settling a claim does not constitute bad faith when there is a genuine dispute as to value, no conscious indifference to the claim, and no proof that the insurer acted from 'any improper motive.'" *Id.* (quoting *Johnson v. Tennessee Farmers Mut. Ins. Co.*, 556 S.W.2d 750, 752 (Tenn. 1977)).

Plaintiff asserts that his formal demand for payment was reflected in Mr. Walker's emails to his superiors at Erie. One of Mr. Walker's emails, dated June 4, 2010, provided, in pertinent part,

[Plaintiff's] attorney wants to sue us and Erie. I feel that Erie is responsible for this claim and should provide coverage. It would be nice to come to a conclusion before the lawsuits start.

[Plaintiff] told me he does not want to sue anybody but [that he] may be left with [no] choice if something does not happen. He has been very patient as this is now approaching seven months and Erie still has not denied the claim. Even if First National Bank is paid for the building damage[, Plaintiff] is going to expect loss of rents as the delay in processing this claim has caused him to

-14-

have increase loss of use and loss of rent.  His attorney told me he feels he has a very good case for loss of rents from a bad faith claim.

In Tennessee, the precedent on this issue is conflicting.  Some cases provide that a simple formal demand for payment is required, while others provide that an explicit threat of litigation is required.  *See Heil v. Evanston Co.*, 890 F3d 722, 730-31 (6th Cir. 2012) (comparing several cases on the issue of meeting the statutory notice requirement).  The record reflects that more than 60 days before filing suit, Plaintiff provided notice to Mr. Walker, Erie's agent, that he intended to file a civil suit in which he would likely raise bad faith if his claim remained unpaid.  Applying either rationale provided for in prior cases, Plaintiff fulfilled the statutory notice requirement contained in section 56-7-105.

E.

Erie asserts that the trial court erred in denying its motion for directed verdict because Plaintiff failed to prove his interest in the Property.  Plaintiff responds that he submitted sufficient evidence concerning his interest in the Property.

The Tennessee Rules of Civil Procedure provide for directed verdicts as follows:

> A motion for a directed verdict may be made at the close of the evidence offered by an opposing party or at the close of the case.  The court shall reserve ruling until all parties alleging fault against any other party have presented their respective proof-in-chief.  A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made.  A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts.  The order of the court granting a motion for a directed verdict is effective without any assent of the jury.

Tenn. R. Civ. P. 50.01.

In considering a motion for a directed verdict, the trial court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 390 (Tenn. 2006) (quoting *Crain v. Benton*, 823 S.W.2d 187, 195 (Tenn. Ct. App. 1991)); *Johnson v. Tennessee Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006).  A motion for a directed verdict should not be granted "if the party with the

burden of proof has presented sufficient evidence to create an issue of fact for the jury to decide." *Burton v. Warren Farmers Co-op.*, 129 S.W.3d 513, 520 (Tenn. Ct. App. 2002) (citing *White*, 21 S.W.3d at 231). A party has created a jury issue when there is doubt about the conclusions drawn from the evidence. *Id.* The grant or denial of a motion for directed verdict is a question of law; therefore, the court's decision is subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

Reviewing the evidence in favor of Plaintiff, as we are constrained to do, the record reflects that numerous witnesses, including Plaintiff, Mr. Walker, and Mr. Jenne, offered testimony concerning Plaintiff's interest in the Property. Mrs. Perry's joint bankruptcy petition, which was entered into evidence, also acknowledged Plaintiff's interest in the Property. Accordingly, we affirm the trial court's denial of a directed verdict in favor of Erie because Plaintiff submitted sufficient evidence to create an issue of fact for the jury.

F.

Erie takes issue with the award of damages. Erie asserts that Plaintiff was not entitled to seek an award of lost rent because he was statutorily limited to the recovery of the insured loss and an additional 25 percent pursuant to Tennessee Code Annotated section 56-7-105, commonly referred to as the bad faith statute. Erie claims that the trial court's award of treble damages was improperly calculated. Erie also argues that the trial court prejudicially erred when it allowed the jury to consider awarding punitive damages because "insureds are not entitled to punitive damages in a first-party insurance claim."

*Loss of rental income*

Citing *Rice v. Van Wagoner Companies, Incorporated*, 738 F. Supp. 252 (M.D. 1990), Erie argues that Plaintiff's recovery was statutorily limited to the recovery of the insured loss, namely $92,630, and an additional 25 percent penalty. Plaintiff responds that the damages awarded were recoverable and contemplated pursuant to the terms of the Policy.

This issue presents a matter of statutory interpretation, which is reviewable as a matter of law pursuant to the de novo standard without any presumption of correctness. *In re Estate of Tanner*, 295 S.W.3d 610, 613 (Tenn. 2009) (citing *Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 802 (Tenn. 2000); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)). The primary objective of statutory interpretation is to carry out the legislative intent without broadening or restricting a statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect

if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). We also presume that the General Assembly was aware of the state of the law when the statutes were enacted and that it did not intend to enact a useless statute. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010).

Relative to claims of bad faith, the Tennessee Code provides, in pertinent part,

(a) The insurance companies of this state, and foreign insurance companies and other persons or corporations doing an insurance or fidelity bonding business in this state, *in all cases* when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, *shall be liable* to pay the holder of the policy or fidelity bond, in addition to the loss and interest on the bond, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that the failure to pay inflicted *additional* expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; and provided, further, that the *additional* liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

Tenn. Code Ann. § 56-7-105(a) (emphasis added). We agree with Erie that the award of lost rent was not likely an "insured loss" pursuant to the Policy when Mr. Walker sought to insure Plaintiff's interest as a mortgagee. In *Rice*, a federal district court held that an insurer's liability was statutorily limited to the insured loss and an additional 25 percent penalty. 738 F. Supp. at 254. *Rice* is a district court order that is not binding on this court. *Leggett v. Duke Energy Corp.*, 308 S.W.3d 843, 871 (Tenn. 2010). In limiting liability, the court in *Rice* held that the legislature's use of the words "in all cases" was dispositive of its intent to designate the bad faith statute as the exclusive remedy in breach of insurance contract cases. 738 F. Supp. at 254. In so holding, the court also quoted extensively from the decision in *Chandler v. Prudential Ins. Co.*, 715 S.W.2d 615 (Tenn. Ct. App. 1986), despite a more recent decision on a similar issue in *Wilson Estate v. Arlington Auto Sales*, 743 S.W.2d 923 (Tenn. Ct. App. 1987).

In *Chandler*, plaintiff alleged that defendant was guilty of the tort of bad faith because defendant breached its duty of good faith and fair dealing by failing to timely fulfill her insurance claim. 715 S.W.2d at 618-19. Comparing the bad faith statute with the worker's

compensation act, the court held that Tennessee did not recognize the tort of bad faith. *Id.* at 621. The court further held that section 56-7-105 provided the exclusive remedy for insureds maintaining an action for the recovery of insurance benefits. *Id.* The court did not address the type of recovery plaintiff could seek if she had brought a breach of contract action. Indeed, the court distinguished the facts in *Chandler* from *MFA Mutual Insurance Company v. Flint*, 574 S.W.2d 718 (Tenn. 1978), wherein the plaintiff brought a breach of contract action to rescind a settlement reached with an insurance company. *Id.*

In *Wilson*, a panel of this court considered the wrongful refusal of a claim upon a credit life insurance policy. 743 S.W.2d at 926-27. Edna Poor ("Aunt") and Wilma Wilson ("Mother") sought to purchase a car for Penny Wilson ("Daughter"). *Id.* at 925-26. Mother and Aunt procured a credit life insurance policy on Mother from the car dealership because they were concerned that Mother's illness would result in the inability to fulfill the terms of the car loan. *Id.* When Mother died, the insurance company refused payment on the policy. *Id.* at 926. Daughter, Aunt, and Mother's estate filed suit against the dealership and the insurance company to recover the benefits of the policy. *Id.* The court assessed fault against the insurance company and awarded the statutory bad faith penalty to Mother's estate and an additional $12,250 to Daughter. *Id.* at 927. On appeal, this court affirmed the award of damages to Daughter but did not specifically address the interplay between the imposition of the bad faith penalty and the award to Daughter.

In upholding the award, the court stated, in pertinent part,

> Western Pioneer also takes issue with the trial court's having awarded Penny Wilson damages in the amount of $12,250. Western Pioneer asserts that at most Penny Wilson should have been awarded only the $6,691.83 principal balance on the loan. Western Pioneer also argues that Penny Wilson has no standing to institute any action under the insurance policy here.

> We have already noted that a valid contract of insurance was entered into by Wilma Wilson and Western Pioneer through its agent, Arlington. "In Tennessee, the requisites necessary to establish a third party beneficiary relationship are: (1) a valid contract made upon sufficient consideration between the promisor and promisee; and (2) the clear intent to have the contract operate for benefit of a third party." The evidence is overwhelming and uncontradicted that Penny Wilson was an intended third party beneficiary and was properly entitled to bring this action.

> There is abundant proof in the record to support the award of $12,250 to Penny Wilson. "The purpose of the remedy of damages is to put the party in as good

-18-

a position as he would have been had the contract been completed, and accordingly a plaintiff may recover for the promise of performance as well as consequential damages." Here, as Western Pioneer admits, the damages for the remaining principal balance on the contract of sale and consumer credit contract are nearly $7,000. In addition, accumulated interest as of the date of judgment made the total due on the credit contract more than $9,000, and prejudgment interest under [section 47-14-123] was properly demanded in the pleadings. The trial court found that Penny Wilson had been deprived of the real and effective use of her automobile as a result of Western Pioneer's refusal to pay the claim.

We affirm the trial court's award to Penny Wilson. It is within the range of reasonableness, is not contrary to the preponderance of the evidence, and does not result from the abuse of discretion.

*Id.* at 930-31 (internal citations omitted).

We believe that *Wilson* is an accurate statement of Tennessee law and more indicative of the legislature's intent in allowing the utilization of the bad faith statute as an additional form of recovery for plaintiffs. *See Myint*, 970 S.W.2d at 925 ("We find nothing in either the Insurance Trade Practices Act or the bad faith statute which limits an insured's remedies to those provided therein."), *superseded by statute*, 2011 Tenn. Pub. Acts ch. 130 § 1 (codified at Tenn. Code Ann. § 56-8-113).[3] *See also Leverette v. Tennessee Farmers Mut. Ins. Co.*, No. M2011-00264-COA-R3-CV, 2013 WL 817230, at \*38 (Tenn. Ct. App. March 4, 2013) (upholding the trial court's grant of directed verdict for breach of an insurance contract and award of compensatory damages). The legislature's use of the words "in all cases" was not dispositive of anything more than an intent to assess an additional penalty against insurance companies when the refusal to pay was not in good faith. Plaintiff was entitled to recover any damages applicable in breach of contract actions and was not statutorily limited to the recovery of the insured loss and the bad faith penalty.

Relative to the damages awarded, "[t]he purpose of assessing damages in a breach of contract suit is to place the plaintiff, as nearly as possible, in the same position he would have had if the contract had been performed." *Wilhite v. Brownsville Concrete Co.*, 798 S.W.2d 772, 775 (Tenn. Ct. App. 1990). "While the amount of damages to be awarded in a given case is not controlled by fixed rules of law or mathematical formulas, [] the evidence upon

---

[3]The Tennessee General Assembly legislatively reversed the Tennessee Supreme Court's holding in *Myint*. *See* Tenn. Code Ann. § 56-8-113. The statute is applicable to claims accruing on or after April 29, 2011. As previously discussed, this case accrued well before April 29, 2011.

which a party relies to prove damages must be sufficiently certain to enable the trier of fact, using its discretion, to make a fair and reasonable assessment of damages[.]" *BankcorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 230 (Tenn. Ct. App. 2006) (citing *Overstreet v. Shoney's*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999); *Wilson v. Farmers Chemical Ass'n*, 444 S.W.2d 185, 189 (Tenn. Ct. App. 1969)). Had Erie promptly reviewed and approved Plaintiff's claim, Plaintiff could have simply regained possession of the Property, repaired the units, replaced the missing items, and rented the units, allowing him to recoup rental income. Instead, Erie delayed the processing of the claim for nearly 16 months, forcing Plaintiff to file suit and impeding his ability to return to his management of the Property. The jury's award of compensatory damages was a fair and reasonable assessment of the damages sustained by Plaintiff as a result of Erie's breach of the insurance contract. Accordingly, we affirm the award of compensatory damages.

### *Treble damages*

Erie asserts that the court erred in trebling the damages pursuant to the TCPA. Erie claims that the "only damages which could possibly be considered actual damages and subject to possible trebling by the jury are the total of $15,139.00 in damages for litigation costs and force-placed insurance." Erie further claims that the jury, not the court should have been tasked with setting the amount of actual damages. Plaintiff responds that the jury, not the court set the amount of damages and that the trial court properly trebled the damages.

The TCPA provides, in pertinent part,

(a)(1) Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful by this part, may bring an action individually to recover actual damages.

* * *

(3) If the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper, except that the court may not award exemplary or punitive damages for the same unfair or deceptive practice.

-20-

Tenn. Code Ann. § 47-18-109(a)(1), (3). The legislature did not define the term actual damages as it pertains to an award of trebled damages pursuant to Tennessee Code Annotated section 47-18-109. *Discover Bank v. Morgan*, 363 S.W.3d 479, 496-98 (Tenn. 2012) (holding that a plaintiff could recover actual damages under the TCPA for loss of credit if the plaintiff submitted sufficient proof of the amount damages requested). Here, the jury assessed damages at $343,430. Having reviewed the evidence, we conclude that the trial court did not err in trebling the damages assessed by the jury.

*Punitive damages*

Citing *Heil v. Evanston Insurance Company*, 690 F.3d 722 (6th Cir. 2012), Erie reasserts its position that Plaintiff was not entitled to damages beyond those contemplated in Tennessee Code Annotated section 56-7-105. Eries insists that Tennessee has not "expanded the scope of damages in first party insurance claims to include general punitive damages." Plaintiff responds that he was "entitled to the jury's consideration of whether punitive damages were appropriate given the facts and circumstances of the case."

We acknowledge the Court's statement in *Heil* that section 56-7-105 "provides the exclusive extra[-]contractual remedy for an insured's bad faith refusal to pay on a policy." 690 F.3d at 728. However, that statement ignores the *Myint* progeny of cases, providing for the application of the TCPA to cases filed prior to the applicability of section 56-8-113. With that consideration in mind, we reaffirm our conclusion that Plaintiff was entitled to recover any damages applicable in breach of contract actions and was not statutorily limited to the recovery of the insured loss and the bad faith penalty. Punitive damages, while generally "not available in a breach of contract case," may be awarded in a breach of contract action under "certain circumstances." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211 n.2 (Tenn. 2012) (citations omitted). To recover punitive damages, the trier of fact must find that a defendant acted either intentionally, fraudulently, maliciously, or recklessly. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). Erie does not argue that the jury was improperly instructed or that the jury failed to consider the applicable factors. Accordingly, we further conclude that the issue of punitive damages was properly submitted to the jury.

*Election of Remedies*

Lest there be any doubt about the effect of our affirmance of both the multiple damages under the TCPA and the punitive damages award, it is clear under *Concrete Spaces Incorporated v. Sender*, 2 S.W.3d 901 (Tenn. 1999), that Plaintiff is entitled to, and must elect, one or the other, but not both, of the awards:

Because multiple damages are punitive in nature and not intended to compensate for the plaintiff's injury, a plaintiff cannot recover both punitive damages and multiple damages in the same cause of action, even if they are each available, because receipt of both forms of enhanced damages violates the principle against double recovery . . . .

\* \* \*

Only after the amount of punitive damages and multiple damages have been assessed is the plaintiff required to make an election between the two types of remedies.

*Sender*, 2 S.W.3d at 907, 911 (citations omitted).

G.

Erie argues that the trial court prejudicially erred when it adopted Plaintiff's findings of fact because the findings did not properly reflect the evidence submitted at trial. Erie notes that the findings erroneously reflect that Plaintiff received letters concerning his coverage on all three buildings that comprised the Property when the letters specifically provided that Plaintiff only had coverage on two of the three buildings. Plaintiff responds that the parties agreed that Mr. Walker intended to request coverage for all three buildings and that the oversight in requesting coverage for only two of the three buildings was not the basis for Erie's denial of the claim.

The issue of party-prepared orders has been addressed recently by this court. *See Smith v. UHS of Lakeside, Inc.*, No. W2011-02405-COA-R3-CV, 2013 WL 210250, at \*8-11 (Tenn. Ct. App. Jan. 18, 2013); *Beach Cmty. Bank v. Labry*, No. W2011-01583-COA-R3-CV, 2012 WL 2196174, at \*5 (Tenn. Ct. App. June 15, 2012). In *Labry*, we observed that

after the adoption of the Tennessee Rules of Civil Procedure, the Supreme Court, in *Delevan-Delta Corp. v. Roberts*, 611 S.W.2d 51 (Tenn. 1981), recognized that "the thorough preparation of suggested findings and conclusions by able counsel can be of great assistance to the trial court." *Id.* at 52-53. Accordingly, the Supreme Court held that "although it is improper for the trial court to require counsel to prepare findings, it is permissible and indeed sometimes desirable for the trial court to permit counsel for any party to submit proposed findings and conclusions." *Id.* at 53.

-22-

The decision in *Roberts* was discussed in detail by this Court in *Madden Phillips Const., Inc. v. GGAT Development Corp.*, 315 S.W.3d 800 (Tenn. Ct. App. 2009). According to this Court:

> The *Roberts* court offered guidance to lower courts when establishing findings of fact. The court maintained a clear preference for factual findings that are a product of the judge's own labor. *Id.* The *Roberts* court recognized, however, that other procedures sufficiently maintain the independence and impartiality of courts that adopt party-prepared findings. The court stated that trial judges may rely on party-prepared findings, so long as they carefully review proposed findings to ensure that the findings reliably reflect the court's opinion based on the testimony and evidence produced at trial. *Id.* The court also recognized a need to ensure that the proposed findings dispose of all relevant issues. *Id.* The court advised trial courts to "ascertain that [party-prepared findings] adequately dispose of all material issues, and to assure that matters not a proper part of the determination have not been included." *Id.*

*Id.* at 810-11.

*Labry*, 2012 WL 2196174, at *5. Accordingly, party-prepared orders are allowable under the following circumstances: (1) the trial court does not require counsel to prepare the orders; (2) the trial court carefully reviews the orders to ensure that the conclusions reliably reflect the court's opinion; (3) the orders dispose of all relevant issues; and (4) no matters not a proper part of the determination are included. *Id.* (citing *Madden Phillips Const., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 811 (Tenn. Ct. App. 2009)). *See also Airline Constr., Inc. v. Barr*, 807 S.W.2d 247, 253 (Tenn. Ct. App. 1990) (noting that the chancellor's opinion reproduced verbatim the proposed findings of defendant).

While the order contains the aforementioned error, nothing in the record indicates that the order entered does not reflect the trial court's view of the case. There is no indication that the trial court did not review the findings to ensure that they disposed of all the issues before it. Accordingly, we hold that the trial court's decision to adopt the proposed order of Plaintiff was not reversible error.

## IV. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Erie Insurance Exchange.

_____
JOHN W. McCLARTY, JUDGE