# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
February 19, 2014 Session

## LEO BERG v. JULIE ANN RUTLEDGE BERG

**Appeal from the Chancery Court for Williamson County**
**No. 33840     Derek Smith, Judge**

---

**No. M2013-00211-COA-R3-CV - Filed June 25, 2014**

---

In this appeal from a final divorce decree, Wife takes issue with a number of the trial court's financial decisions. Specifically, Wife contends the trial court erred in the assessment of spousal support, in classifying marital property as Husband's separate property, in valuing Husband's woodworking business, in dividing the marital estate, in finding she dissipated the marital estate, in declining to find that Husband dissipated the estate, in failing to sanction Husband for non-production of documents, and by sanctioning her $100,000 under Tenn. R. Civ. P. 37.02 for abuse of discovery. Finally, Wife alleges error in failing to grant the divorce to both parties and contends the trial court should not have verbatim adopted portions of Husband's proposed findings of fact and conclusions of law as its final judgment. We affirm the trial court's rulings on these issues. Husband also seeks his attorney's fees incurred on appeal which we respectfully deny.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT, J., and BEN H. CANTRELL, SR. J. joined.

Andrew M. Cate, Brentwood, Tennessee, for the appellant, Julie Ann Rutledge Berg.

Sarah Richter Perky and John J. Hollins, Jr., Nashville, Tennessee, for the appellee, Leo Berg.

# OPINION

Leo Berg ("Husband") and Julie Ann Rutledge Berg ("Wife") were married in 1979 and resided for a majority of their marriage in a home located on 36 acres of land in Franklin, Tennessee. They had three children together, now adults.

Both Husband and Wife are college-educated and were casually employed, living primarily on substantial passive income from minority interests in several family businesses ("the Berg entities") Husband inherited. Husband was self-employed running a wood-working business, Piedmont Gallery, Inc., at little to no profit. Although Wife maintained an active real estate license and had some experience with relatively high-end real estate, she seldom worked. The couple also purchased, renovated, and leased commercial property in Franklin, grossing approximately $5,000 monthly in rental income.

Because Husband and Wife's standard of living often exceeded their income, they intermittently obtained loans from a line of credit issued by MEL Enterprises, a Berg entity. The proceeds of these loans were utilized for various purposes including the construction of and improvements to marital homes and paying federal income tax debt. Prior to the commencement of this action, Husband and Wife both signed documents acknowledging the amount owed on this debt; however, in 2006 Wife refused to sign written acknowledgments of the debt. As a consequence, MEL Enterprises demanded payment but Husband and Wife failed to pay off the loans. To prevent default, Husband's brother, Mickey Berg, acquired the loans and, thereafter, Husband borrowed additional monies from his brother.

After discovering Wife was engaged in an adulterous affair with a real estate colleague, Husband filed for divorce on August 16, 2007. The parties' attempts to reconcile over several months were fruitless; Wife filed an answer and counter-complaint for divorce on May 15, 2008.

The ensuing divorce proceedings, which lasted an additional four years, were rife with discord resulting in well over 100 motions and 2,500 pages of technical record. Key issues sparking controversy and contributing to delay included, but were not limited to, Wife's hiring of seven successive attorneys to represent her during the proceedings in the trial court; she hired her eighth attorney to pursue this appeal. Other controversies included Wife's *pendente lite* family support, Wife's claims that Husband and his family in Arkansas were intentionally thwarting her efforts to obtain documents responsive to her numerous requests for production, four sets of interrogatories, requests for admission, and lists compiled by her consulting expert witnesses.

Although this litigation was by no means amicable, the parties never disputed that Wife was the more economically disadvantaged spouse. She initially received $5,000 per month in partial *pendente lite* temporary support from the rental income associated with the parties' commercial property and Husband was responsible for paying household expenses. This amount was significantly increased in May 2009, when Husband was directed to deposit $25,000 per month into an escrow account for Wife to draw from to pay bills and support their youngest child. Rental income was concomitantly switched over to Husband. This remained the status quo until the summer of 2011. After Wife's sixth attorney withdrew, the trial court offered Wife the option to proceed with the impending trial date or continue the trial date with a reduction in her *pendente lite* support. Wife elected to continue the trial date and the court reduced her monthly support from $25,000 to $15,000 per month, effective August 1, 2011.

Much of the voluminous record is consumed by Wife's unrelenting pursuit of documents and information which she felt was necessary to establish her consulting expert's opinions. As the Berg entities were valued at over $6 million and were the mainstay of the parties' income during their marriage, Wife had a vested interest in trying to show these entities, inherited from Husband's parents, were marital rather than Husband's separate property.[1]

As discussed above, Wife's seven successive trial attorneys served repeated volleys of discovery seeking evidence to support her claims that the Berg entities were marital assets. Although Husband and his family produced well over 20,000 pages of documents, or signed releases, for what amounted to often antiquated information, such as bank records or tax returns, Wife was never satisfied, filing no less than five motions to compel discovery, eight motions for either civil contempt or sanctions, and one motion to reconsider sanctions for discovery non-compliance.[2] Although every one of Wife's motions for sanctions or for

---

[1]Husband's father died in 1975 and, pursuant to his will, his ownership of various timber and oil interests were placed into two trusts. The first trust was for Husband's mother, Helen Berg, and the second trust provided a lifetime income benefit to Helen Berg, with the principal of the trust to pass to the remaining beneficiaries, namely Husband and his two siblings, Elaine Berg and H. M. "Mickey" Berg, upon her death in equal shares. Over the years, Husband's mother annually gifted some of her inheritance to her three children and her grandchildren. Following her death in March 1990, her three children inherited their respective shares of the Arkansas business entities from her estate as well as the trust. Over the last 20 years, these family businesses have been managed by Husband's siblings. The evidence at trial showed Husband made no capital contributions to any of these entities nor guaranteed any of the debt of these entities during his marriage.

[2]The trial court found that Wife filed eleven motions for contempt and thirteen motions for sanctions, but our count differs slightly.

contempt were denied,[3] the trial court and the parties devoted tremendous resources to accommodating Wife's endless discovery requests. In addition to the time and expense associated with multiple hearings, Wife's experts were allowed at least two opportunities for extensive document reviews in Arkansas where the Berg entities, their accountants, and Husband's personal accountant were officed. The trial court also ordered Wife's consulting experts to meet with Husband's experts on several occasions to reconcile what documents were truly necessary to formulate their opinions.

For reasons unidentified in the record, but to her detriment, Wife switched consulting forensic experts within weeks of trial and then failed to properly disclose any experts to testify regarding the voluminous documents produced by Husband. Her efforts to salvage the situation with complete disclosure was too little too late, as the trial court granted Husband's motion to exclude her experts.

This matter was tried over five days in April and May 2012. Husband presented the testimony of multiple fact and expert witnesses to support his position regarding the division and valuation of marital and separate property. Significant testimony was elicited to show the Berg entities were separate property, including testimony from Jim Osborne, the Berg entities' accountant, Wayne Weathersby, an oil and gas expert, Tom Price, an expert forensic accountant, bookkeepers and employees of the Berg entities, and Husband's brother and sister who manage those businesses. A certified commercial real estate appraiser, Tom McArthur, also testified as to the values of the marital residence and acreage and two Nashville rental properties, and Victor Andrews, a certified residential real estate appraiser, testified regarding Piedmont Gallery. On the other hand, Wife, with no experts in her arsenal, relied exclusively on lay testimony and her own estimates for valuation of all of the property to convince the trial court that the Berg entities were marital assets.

The trial court granted Husband a divorce on the grounds of Wife's adultery and inappropriate marital conduct. The court classified all of the Berg entities as Husband's separate property. The marital estate was divided relatively equally, with Husband being awarded Piedmont Gallery, the marital home, and the parties' commercial real estate. Wife was awarded significant home furnishings as well as a cash award of $1,074,099.50. She was awarded rehabilitative alimony of $8,000 per month for ten years. Pursuant to Tenn. R. Civ. P. 37.02, Husband was awarded $100,000 as sanctions for Wife's repeated abuses of the discovery process engendered by Wife's employment of seven successive trial attorneys, her demands for continuances or necessitating continuances, and her relentless pursuit of meritless motions for sanctions and for contempt.

---

[3]The trial court found there was no proof of Husband's misconduct.

**ANALYSIS**

In her brief, Wife provided the following "Statement of the Issues"

I. The trial court abused its discretion by plagiarizing and entering Husband's proposed findings as the final ruling of the court in this cause, without regard to the significant errors of fact and misapplication of the law.

II. This court should rule on all aspects of this case based upon a de novo review of the record.

III. This court should enter findings of fact pursuant to Tenn. Code Ann. § 27-1-113.

Respectfully, the second and third "issues" stated above are simply not issues as contemplated by the Tennessee Rules of Appellate Procedure. For example, issues II and III are merely requests for this court to go on a hunting expedition without a guide or a map. Not only are the issues as identified in the appellant's brief of little value, throughout her arguments Wife globally and repeatedly asks this court to review the record in its entirety de novo "in light of the court's complete disregard of the proof," find error "on all aspects of the case," and find that "the abuse of discretion is clear and warrants the setting aside of the court's entire ruling." Such requests are not conducive to an appropriate review of a trial court's rulings; moreover, it is not this court's responsibility to comb through the record searching for error. *See* Tenn. R. App. P. 27; *Emrich v. Adams*, No. E2012-00725-COA-R3-CV, 2013 WL 1200250, at *6-7 (Tenn. Ct. App. Mar. 26, 2013); *Duchow v. Whalen*, 872 S.W. 2d 692, 693 (Tenn. Ct. App. 1993). As we explained in *Emrich v. Adams*, "In order for an issue to be considered on appeal, a party must, in his brief, develop the theories or contain authority to support the averred position as required by Tennessee Rules of Appellate Procedure 27(a)." *Emrich*, 2013 WL 1200250, at *8 (citations omitted).

Nevertheless, our detailed review of the brief helped us identify the following as issues appropriate for review. Specifically, Wife contends the trial court erred in granting Husband the divorce on the grounds of Wife's adultery and inappropriate marital conduct, in its valuation of Piedmont Gallery, the classification and division of property, and the award of alimony. Further, Wife contends Husband failed or refused to provide responsive answers to her discovery requests and that he, in collaboration with his family, was uncooperative and intentionally hindered her efforts to secure proof that the Berg entities were marital property. Although Husband was ordered to appropriately respond to Wife's discovery requests, Wife contends Husband never fully complied with these orders; thus, she asks that we overrule the trial court's decision to deny her final motion for sanctions filed

two weeks prior to trial. Finally, Wife claims she should not have been sanctioned for discovery abuse.

## I. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Wife contends the trial court abused its discretion by plagiarizing Husband's proposed findings as the final ruling of the court, without regard to the significant errors of fact and misapplication of the law. We find no merit to this argument.

At the conclusion of the trial on May 7, 2012, the trial court requested counsel for both parties to submit proposed findings of fact and conclusions of law and neither counsel objected. Within a couple of weeks, counsel for Wife and Husband each submitted their proposed findings of fact and conclusions of law. The trial court adopted the majority of Husband's proposed findings of fact as the court's findings and, subsequently, entered final judgment in the action on August 29, 2012.[4] Although she cites no authority whatsoever to support her contention, Wife insists this constitutes "plagiarism" and an abuse of discretion.

Without any citation to the record to support this factual assertion, Wife maintains that the judge did not carefully review the final order, and she contends the judge was pressed for time in entering the findings of fact and conclusions of law. She insists the judge was charged with reviewing a rather extensive record in the short period of time between the final day of trial and leaving the bench. Wife further contends that Husband's proposed findings of fact and conclusions of law took advantage of the situation, were contrary to the record, and contained "significant errors of fact and misapplication of the law." As such, she argues that we should presume the judge hurriedly adopted Husband's proposed findings of fact and conclusions of law almost word-for-word with no independent review. We are not persuaded by these unsubstantiated assertions.

We begin our analysis of this issue by debunking the assertion that a trial court abuses its discretion by requesting and then adopting some or all of a party's proposed findings of fact and conclusions of law, or by approving an order prepared by a party's counsel at the request of the court, with or without modifications by the court. In the past couple of years, this court has been called upon on multiple occasions to address the issue of party-prepared findings and orders. *See Beach Cmty. Bank v. Labry*, No. W2011-01583-COA-R3-CV, 2012 WL 2196174, at *5 (Tenn. Ct. App. June 15, 2012); *Smith v. UHS of Lakeside, Inc.*, No. W2011-02405-COA-R3-CV, 2013 WL 210250, at * 8-10 (Tenn. Ct. App. Jan. 18, 2013);

---

[4]On October 19, 2012, Wife filed motions for a new trial, to alter or amend the final decree and to amend the findings of fact; these motions were heard by the trial judge and an order was entered denying same on December 5, 2012.

*Riad v. Erie Ins. Exch.*, No. E2013-00288-COA-R3-CV, 2013 WL 5874733, at *18 (Tenn. Ct. App. Oct. 31, 2013); *Johnston v. Johnston*, No. E2013-00525-COA-R3-CV, 2014 WL 890758, at *14-15 (Tenn. Ct. App. Mar. 6, 2014). It is a long-standing practice in this state for a trial court to request that the parties submit proposed findings of fact and conclusions of law and orders following either a hearing or trial on the merits.

Based on principles first articulated by the Tennessee Supreme Court in *Delevan-Delta Corp. v. Roberts*, 611 S.W. 2d 51 (Tenn. 1981), party-prepared orders are permissible under the following circumstances: (1) the trial court does not require counsel to prepare the orders; (2) the trial court carefully reviews the orders to ensure that the conclusions reliably reflect the court's opinion; (3) the orders dispose of all relevant issues; and (4) no matters not a proper part of the determination are included. *Johnston*, 2014 WL 890758, at *15 (citations omitted).

This record is devoid of any proof that the order does not reflect the trial court's views of the evidence or that the trial court did not take the time to review the record as it deemed appropriate. We further note that three months elapsed between the submission of the proposed findings of fact and conclusions of law by the parties and the entry of the judgment; thus, the assertion of a hurried process is not substantiated by the record. Further, the trial transcript reflects several comments by the judge wherein he assured the parties during the proceedings that he had a clear grasp of the issues and their respective positions and the trial judge did indeed alter Husband's proposed findings, which indicates the court undertook a proper review.[5]

Accordingly, we find this issue without merit.

## II. TENN. R. CIV. P. 37.02 SANCTIONS

We next consider the trial court's rulings concerning sanctions for discovery abuse and delay. Wife appeals the trial court's decision to deny her motion for sanctions on the eve of trial, March 27, 2012. As in the two aforementioned issues, this issue is repeatedly raised throughout her brief in support of reversal of all issues. Wife also appeals the court's decision to grant Husband $100,000 in sanctions for attorney's fees. As these two issues inextricably involve the same facts and procedural history, we will examine them together. The following summary provides insight into the context in which the trial court made these two decisions.

---

[5]As an example, the trial court, on its own initiative, increased the amount Husband's proposed alimony of $6,000 per month to $8,000 per month.

A. Procedural History and Background

After Husband filed suit in August 2007, the parties engaged in initial written discovery. Trial was set by agreement for December 2, 2009. During the first two years the suit was pending, Wife was represented by four different attorneys: Marlene Moses from August 2007 to September 2007; Pam Taylor from September 2007 to February 2008; Ernest Williams from February 2008 to March 2009; and Patricia Carter beginning in March 2009.

On June 23, 2009, Wife's fourth attorney, Ms. Carter, filed a motion requesting, in part, that the trial date be continued; this motion was denied. These four attorneys propounded two sets of interrogatories and requests for production on Husband. Unhappy with Husband's responses, Wife filed three motions to compel in this time period as well as her first motion for civil contempt, all of which were resolved by agreed order. Wife voluntarily withdrew her motion for contempt, and Husband agreed to supplement the second set of discovery by September 10, 2009. Presumably, all issues as to the first set of discovery were felt to be resolved at that time, as there was no mention of this discovery in the ensuing order.

On October 1, 2009, the final day of written discovery per the scheduling order, Wife served her First Requests for Admission and Third Requests for Production of Documents on Husband, requesting information and documentation regarding the Berg entities. On October 12, 2009, Wife filed a comprehensive combined motion for sanctions pursuant to Tenn. R. Civ. P. 37.02 and to compel discovery responses for Husband's responses to the second set of discovery, categorizing his responses into five areas of inadequacy: (1) responses she felt were false, (2) responses she believed did not address the requests, (3) incomplete responses, (4) groundless objections, and (5) responses that offered to make "unspecified documents" available to Wife's counsel in Arkansas. She also again asked for a continuance of the trial date. Upon hearing the following month, the trial court walked through the interrogatories and requests for production, granting or denying each inquiry. There was also a discussion by the parties of entering a confidentiality agreement to protect sensitive documents provided by the Berg entities. The court reserved ruling on the motion for sanctions until the next motion date when the court planned to re-evaluate Husband's compliance. Husband was ordered to supplement his discovery by November 25, 2009. Husband and Wife were also directed to disclose their experts and arrange for the experts to discuss and identify the documents mutually needed to formulate their opinions. The December trial was continued by agreement to August 2010.

On December 18, 2009, Ms. Carter filed a motion to withdraw, which was granted in January 2010. Attorney Miles Mason, Wife's fifth attorney, made his appearance the following month and served Wife's Fourth Requests for Production requesting various tax

returns on February 26, 2010. Mr. Mason filed a motion to reconsider the November 4, 2009 rulings on the motions to compel and for sanctions.[6] The parties' experts had not yet met, which Wife attributed to Husband's failure to supplement his responses in accordance with the court's ruling. On February 19, 2010, and March 5, 2010, Husband filed motions for protective order which respectively requested entry of the confidentiality agreement discussed at the November hearing and that the court strike Wife's fourth set of document requests.

All of these motions were heard by the court on March 10, 2010. An oral motion at this hearing for continuance of the trial date by Wife's counsel was denied. The parties agreed to enter a protective order for the benefit of the Berg entities, and Husband agreed to respond to the fourth requests for production. Husband was to deliver the discovery ordered at the November 4, 2009 hearing to Wife by March 12, 2010. The trial court further ordered Wife's expert, Robert Vance, and Husband's expert, Gerald LeCroy, to travel to Arkansas to visit the offices of the Berg entities' accountant James Osborne, CPA, as well as the Berg family business offices and "meet together and review any and all documents, related to Husband, Wife, or any of the Berg family businesses, which are in the possession of James Osborne, CPA. . . ." The experts were to notify the trial court of any documents they required, and the court was to hear any disagreements. Finally, the trial court denied Wife's motion to reconsider its rulings from the November 2009 hearing.[7]

In the interim time between hearings, Wife served her Fifth Requests for Production of Documents, Fourth Set of Interrogatories, and she filed another motion for continuance of the trial setting. Although the first wave of discovery appeared to be resolved in 2009, Wife's replacement attorney decided to serve an "amended" First Set of Interrogatories and Requests for Production in an attempt to obtain additional information. Husband filed a motion for protective order. The parties' experts, Mr. Vance and Mr. LeCroy were able to agree on a list of documents and computer records appropriate for production. What should have then been a simple matter of scheduling, became a jurisdictional tug-of-war when Arkansas counsel for the Berg entities and their accountants became involved in establishing the parameters of the document inspection and filed pleadings in Arkansas to protect their clients' interests leading to delay as the parties negotiated these issues. Concerned with the delays, Wife filed an amended motion for a continuance of the August 2010 trial setting.

_____

[6]The order from the November 4, 2009 hearing was entered on March 3, 2010.

[7]Although the trial court denied this motion, it in fact granted one of Wife's requests, expanding the scope of her discovery requests to include Berg Bros. Land & Timber, LLC, MEL Enterprises, Berg Royalty Co., Berg Enterprises Operator, Inc., Berg Bros., Berg Laney & Brown Partnership, Berg Enterprises, Inc., Berg Oil Co., Leo Berg Co., LLC, Berg Laney & Brown Co., Piedmont Gallery, Inc., and AML Realty.

At the next motion hearing in June 2010, discovery deficiencies related to the Berg entities' document production were deferred until after the out-of-state review was accomplished. Otherwise, Husband was to supplement his discovery responses. The trial court stated:

> I've said numerous times, I don't begrudge [Wife's counsel] Mr. Mason for coming in on his request. The Court believes we've dealt with these issues before. On the same token, I don't believe it's proper for me right now to make a finding, basically, that Mr. Berg, through his own actions, has stonewalled discovery. Does it appear unusual to the court that this many lawyers all of a sudden would become involved? It does. But the Court doesn't issue sanctions based on unusual behavior. . . . At the final hearing, if the court believes that Mr. Berg has been attempting to hide assets, has been attempting to stonewall discovery, then I can pretty much guarantee Ms. Berg she's going to receive a lot more than $20,000 of attorney's fees. But I'm not going to make that ruling here today. . . . There's just no basis for me to make those types of final decisions. I don't think I've got enough evidence before the court to make those final decisions. Does Mr. Mason have a right to be annoyed? Yes. Do you get sanctions for being annoyed? Certainly, no. There has to be proof of some misconduct. I have a feeling that has not been shown here today to the Court's satisfaction.

The issue of sanctioning Husband with Wife's attorney's fees was thus reserved until the final hearing. Husband's motion for protective order was granted in part and denied in part, with the amended discovery quashed in its entirety and the Fifth Request for Production of Documents held in abeyance; however, Husband was compelled to respond to Wife's Fourth Set of Interrogatories. The parties agreed to continue the August trial setting.

Document review eventually transpired over the course of two visits to Arkansas in July and September 2010, and Husband twice supplemented his responses to the discovery inquiries concerning his personal finances, but Wife remained frustrated with what she perceived as a "combative atmosphere." She filed a series of motions and amended motions for sanctions and civil contempt leading to a two-day hearing in December 2010. Husband asserted that he had produced all documents, with limited exception, or that he had executed and provided the appropriate releases to obtain records. Further, he pointedly noted that there were several boxes of documents that Wife's expert had opted not to copy which he felt were responsive to the perceived deficiencies. The trial court observed that it had granted "very liberal discovery in this case, allowing Ms. Berg to go a significant period of time through a significant number of documents in order to fairly valuate the businesses." The court further stated:

-10-

[I] cannot hold Mr. Berg solely responsible for the fact that lawyers were brought in in Arkansas on behalf of these corporate entities, on behalf of these individual corporate enterprises to represent the corporation's interest.

Now, could Mr. Leo Berg have thwarted that to some degree? Maybe. He maybe could have stood in the way and said, No, as an officer, I'm asserting my rights. But, again, during the course of that marriage, my Court's going to find he's very rarely asserted any of his corporate rights and probably doesn't know how to do so even if he could have. The Court is not going to hold him responsible for these other attorneys getting involved.

With that being said, as to all of these requests for contempt, they're numerous, they're well drafted, they're specific, and they're reasonable. However, the Court is not inclined to find Mr. Berg willful in his action towards this divorce, and the Court is not going to grant sanctions or hold Mr. Berg in contempt.

With that being said, I mean, the Rules of Civil Procedure, when it comes to discovery, are not that difficult. The fact is, is that if one party in the divorce is more capable of gaining access to documents necessary for the divorce than the other party, they are required to gain access to the documents. Mr. Berg has failed to do so. But is he in willful contempt? No, he's not in willful contempt.

The court's written order reflected the following findings:

7. Husband's discovery has been deficient.

8. Mr. Daniel Carter and Mr. Gary Burbank, attorney's acting on behalf of the Berg entities, forestalled and thwarted to some degree the easy progression of discovery in this matter.

9. Mr. Carter and Mr. Burbank's actions and the inaction of Husband increased the amount of attorney's fees needed for discovery in this case.

10. Husband, as an officer of the Berg entities, has access to the Berg entities, the attorneys and the records.

11. For purposes of this hearing [and] this hearing alone, the court finds that although an officer of the Berg entities, Husband has never been an active participant in the company.

-11-

12. At this time, it is inappropriate to credit Husband with the knowledge and ability to contact all the Berg entities, its attorneys and its accountants to gather the documents requested by Wife since Husband has never attempted to obtain this information prior to these proceedings.

13. Husband has not been willful in noncompliance with Wife's discovery requests.

14. Counsel for Husband has definitely given and complied with the vast majority of Wife's discovery requests and he should be credited for that.[8]

15. There was no evidence presented that Husband is responsible for the fact that Mr. Carter and Mr. Burbank were retained on behalf of the Berg entities to represent the corporation's interest.

16. For purposes of this hearing and this hearing alone, the court finds that during the course of the marriage, Husband has very rarely asserted any of his corporate rights and probably does not know how to do so even if he could.

17. Husband should have asserted his rights as an officer of the Berg entities to obtain the requested documents. However, Husband is not guilty of contempt for failing to do so because over the past twenty (20) years of marriage, Husband never did so and the Court cannot assume Husband should do so now.

\*\*\*

22. Husband has complied with Wife's discovery requests generally; however, there are significant gaps in discovery as to the initial value of the assets.

As a result, Husband was ordered to submit documents and information listed in the exhibits attached to Wife's motion for sanctions and civil contempt to Wife no later than seven days prior to a discovery compliance review to be conducted on February 22, 2011. The parties and their experts were to then identify which documents were still needed or had not been produced. The parties subsequently entered an agreed order setting trial for July 25, 2011. Mere days before the compliance hearing was set to occur, Mr. Mason withdrew as

---

[8]The trial court further acknowledged Wife's counsel's "frustrations in his attempts at discovery" and found that "[o]ver the past six months, it does seem that a lot of information has been provided based primarily on the motion for sanctions. I don't disagree with that."

counsel for Wife, and Wife's sixth lawyer, Dana McClendon, appeared on her behalf. Whether the compliance hearing occurred thereafter is not entirely clear as no order was generated, but the record implies the parties participated in some sort of telephone conference with the court.

On April 12, 2011, Mr. McClendon filed a very general motion to compel on behalf of Wife again requesting that Husband cooperate in document production, which was addressed by the trial court in a hearing shortly thereafter. The trial court ordered counsel for Wife to provide correspondence to Husband identifying any information still needed to prepare for the depositions of the Arkansas witnesses and documents to be brought to these depositions. The parties scheduled depositions by agreement as trial was near, but Mr. McClendon and Wife had irreconcilable differences that led to his withdrawal, leaving her again without representation as of May 31, 2011. Depositions of the Arkansas witnesses were canceled and Wife filed a pro se motion for continuance of the trial, which Husband opposed. Husband additionally asked the court to order Wife to reimburse his attorney's fees and expenses due to a continuance. Seeking an equitable solution, the court stated it would grant Wife a continuance but her *pendente lite* support would be reduced to $15,000 per month, effective August 1, 2011. Wife continued to represent herself until December 2011, when Wife retained her seventh attorney, Martin Sir, who represented her through the completion of the trial. The trial date was reset to April 18, 2012; the court expressly stated that this was the final continuance.

Wife's new counsel wasted no time in re-treading prior ground, filing a motion to amend the December 2010 discovery order, as well as another motion for sanctions. At the January 24, 2012 hearing, the trial court denied the motions, observing that Wife had not complied with the ruling some nine months previous to send correspondence to Husband specifying remaining documents to be produced. Wife was again instructed to send this letter. Husband was to produce documents or, alternatively, sign an affidavit stating that they were not in his or his agent's possession or control and execute a release so that Wife could obtain copies. Wife sent the requisite correspondence to Husband on or about January 30, 2012, with requested releases.

Only two weeks after submitting the foregoing letter, Wife filed additional motions for civil contempt and sanctions on February 14, 2012. Although the trial court had previously notified the parties that no more continuances would be entertained, Wife again requested a continuance of the trial date until 90 days after the requested records were received. Husband responded with an affidavit stating:

The documents requested in counsel for Mrs. Berg's January 30, 2012 letter have been produced, made available for copying [during the 2011 inspection], or are not in my or my agent's possession or control.

He further argued that the only items which had not been produced were electronic Quickbooks records for which hard copies had already been provided, pointed out to the court that Wife's expert, Mr. Vance, had chosen not to copy over 4,000 pages worth of documents during the 2010 document review, and noted that releases for bank records had been signed.

At the February 21, 2012 hearing, Wife relied on the categories of documents previously identified by her consulting expert accountant, Mr. Vance, but also advised for the first time that Mr. Vance had been replaced by another certified public accountant, Mike Costello. Wife's motions were again denied, with the trial court questioning from the bench why it should grant a motion based upon an expert which Wife no longer planned to use. The foregoing notwithstanding, Husband was directed to produce the 4,000 pages by the end of the week and have his client sign the appropriate release for tax documents from the Internal Revenue Service. Husband's expert, certified public accountant Tom Price (Mr. Price replaced Mr. LeCroy on or about April 2011), and Wife's forensic expert were to meet in the next two weeks and determine what documents, if any, were still necessary for their opinions. The court set up a scheduling order with an expert disclosure date of March 1, 2012, and trial remained set for that April.

In accordance with the order, a compact disc of the 4,000 pages was produced to Wife by February 24, 2012, IRS releases were executed by Husband and his brother, the electronic Quickbooks were provided in a flash drive to Wife on March 8, 2012, and timber valuation records were produced by March 24, 2012. Wife complained of technological problems with the compact disc on February 27, 2012, and Husband's counsel immediately replaced it. On that same date, Wife also filed a motion for extension of time to file her Tenn. R. Civ. P. 26.02 expert disclosure, attaching the affidavit of her new forensic consultant, Mr. Costello, which reflected that he had been retained as a testifying expert, that the documents identified in the February 14, 2012 motion were necessary for his review, and that his valuation would take at least 90 days from the date the documents were received; by its terms, this motion implicitly would have required a continuance of the April trial date. Some disconnect in communications between the parties and experts transpired, the end result of which was Wife's expert never met with Husband's expert as ordered. Wife served a timely but incomplete Tenn. R. Civ. P. 26.02 expert disclosure on March 1, 2012, comprised solely of a list of names and addresses.

On March 27, 2012, just over two weeks from trial, Wife filed her final motion for sanctions. Husband responded in kind with a motion to exclude Wife's expert witnesses attacking the sufficiency of her expert disclosure. Wife's motion for sanctions rehashed all her prior motions and was premised on two grounds – an overall complaint of *delay* in production of documents regarding timber, electronic Quickbooks, and tax returns and allegations of false or misleading statements by Husband at various times during discovery. She again attached the affidavit of her consulting expert Mr. Costello dated February 17, 2012, which claimed he required the same documents as Wife's previous consulting expert, Mr. Vance, for the formulation of his opinions. Husband refuted Wife's claims submitting an affidavit of his expert Mr. Price that the information requested by Wife was not germane and noting he had acted in good faith, produced over 20,000 pages of documents and met the terms of the order from the February hearing. A hearing was held on April 3, 2012. Wife's motions were denied, and Husband's motion to exclude Wife's experts was granted.

## B. DENIAL OF WIFE'S MOTIONS FOR SANCTIONS

Wife contends on appeal that her March 27, 2012 motion for Tenn. R. Civ. P. 37.02 sanctions should have been granted.[9] Within that motion she requested that the court impose the "severest sanctions" available under Tenn. R. Civ. P. 37.02 for Husband's delay in producing documents, perjury, unclean hands, and denying Wife an opportunity for a fair trial. She asks that we find that the following facts are established:

a. The appreciation in value of Husband's interest in the Berg entities during the marriage is marital property.

b. Husband's interest in the Berg entities has been commingled with marital property.

c. Husband's interest in the Berg entities has been transmuted into marital property.

d. That Husband be denied the right to oppose the foregoing established facts.

---

[9]Wife also vaguely protests in her brief that Husband "never fully complied with the Orders compelling him to respond to Wife's discovery responses," but exerted no effort on appeal to identify these other "orders" or explain how Husband failed to do so. As discussed above, we are not obligated to search the record for error.

-15-

For the reasons explained below, we do not reach the issue of the appropriate sanctions to impose, as we find that the trial court did not abuse its discretion in denying her request for sanctions.

Tenn. R. Civ. P. 37.02 provides a "broad but not exclusive list of sanctions available to a trial court when a party fails to obey an order compelling discovery." *Dhillon v. Dhillon*, No. M2009-00017-COA-R3-CV, 2010 WL 1254365, at *9 (Tenn. Ct. App. Mar. 31, 2010); *Magness v. Couser*, No. M2006-00872-COA-R3-CV, 2008 WL 204116, at *6 (Tenn. Ct. App. Jan. 24, 2008). Specifically, the Rule states:

> If a deponent; party; an officer, director, or managing agent of a party; or, a person designated under Rule 30.02(6) or 31.01 to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under Rule 37.01 or Rule 35, or if a party fails to obey an order entered under Rule 26.06, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
>
>> (A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;
>> (B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;
>> (C) A order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;
>> (D) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination[.]

By its plain language, the provisions of Rule 37.02 primarily apply to sanctions for non-compliance with a court order. *Alexander v. Jackson Radiology Assocs., P.A.*, 156 S.W.3d 11, 15 (Tenn. Ct. App. 2004) (citing *Lyle v. Exxon*, 746 S.W.2d 694, 698-99 (Tenn. 1988)). However, trial courts also possess the inherent authority to order sanctions as necessary to prevent abuse of the discovery process. *Id*. (citing *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 133 (Tenn. 2004)). We discussed the inherent purpose of Tenn. R. Civ. P. 37.02 discovery sanctions in *Mansfield v. Mansfield*:

> The discovery rules would be ineffectual if courts did not have the authority to impose sanctions for their abuse. Thus, the Tennessee Rules of Civil Procedure authorize serious sanctions against persons who seek to evade or thwart full and candid discovery, including being found in contempt, having designated facts be taken as established, striking pleadings, dismissing an action or claim or granting a judgment by default, or assessing expenses and attorneys' fees. These sanctions serve a three-fold purpose: (1) to secure a party's compliance with the discovery rules, (2) to deter other litigants from violating the discovery rules, and (3) to punish parties who violate the discovery rules.

*Mansfield*, No. 01A019412CH0058, 1995 WL 643329, at *5 (Tenn. Ct. App. Nov. 3, 1995) (citations omitted). We affirm the trial court's decision as Wife has not met her burden under *Parks v. Mid-Atl. Fin. Co., Inc.* of "affirmatively showing" that the trial court acted outside its discretion in denying this motion. *Parks*, 343 S.W.3d at 802.

The principal deficiency in Wife's numerous motions for sanctions or contempt is that she failed to explain why the 20,000 pages in documents previously produced were inadequate. While early on in litigation Wife offered a long list of documents and categories of documents she desired, these items were pared down over time as Husband and the Berg entities produced documents or provided releases, her expert attended document reviews in Arkansas, and the consulting experts identified items necessary for their review. We are not convinced nor has Wife shown that there were any documents withheld or delayed in delivery which were the euphemistic smoking gun, if you will, for valuation, transmutation, commingling, or dissipation. Instead, we find it extraordinarily significant, as even conceded by Wife, that Husband produced the court-ordered documents, namely the 4,000 pages not previously copied by Wife's consultant at the Arkansas review, the timber documents, the electronic Quickbooks duplicative of hard copies previously produced, and the releases necessary for obtaining miscellaneous tax returns.

Moreover, in the numerous motions filed by Wife, the heart of her argument is that the documents requested were needed so that her consulting forensic experts, first Mr. Vance, and then Mr. Costello, could render a valuation opinion. The court even recognized this inherent purpose in ordering the parties' experts on multiple occasions to meet, discuss, and analyze what items were necessary in formulating their respective opinions. However, the trial court excluded her expert witness from testifying because Wife failed to comply with Tenn. R. Civ. P. 26, and she has not appealed that ruling.

Finally, we are not persuaded that the trial court erred by not finding that Husband made false or misleading statements or perjured himself in discovery warranting sanctions. This portion of the motion references alleged statements in unidentified written discovery responses, purportedly contradicted by proof submitted at a April 23, 2009 hearing and deposition testimony. We have reviewed the excerpted transcript from the April 23, 2009, hearing which concerned non-discovery motions, and find no reference to false or misleading statements asserted by Wife in her motion. Additionally, Wife did not attach any of the written discovery to her motion which she claims was false. We do not have any basis for finding that the trial court abused its discretion. In light of the breadth of the trial court's authority in imposing sanctions, Wife has again not met her burden of demonstrating that the trial court abused its discretion in denying sanctions for false statements. *See Alexander*, 156 S.W.3d at 17-18.

## C. MONETARY SANCTIONS FOR WIFE'S DISCOVERY ABUSES

The foregoing recitation of facts and procedural history also pertain to the trial court's decision to sanction Wife $100,000 for attorney's fees under Tenn. R. Civ. P. 37.02, finding her actions excessive. Wife appeals this finding arguing that it was improper under our law.

Wife argues her discovery requests and motions had merit, therefore, the trial court abused its discretion in awarding Husband $100,000 as discovery sanctions. She also states that the award was improper because Husband conceded he is not entitled to alimony. Indeed, Husband has never asserted that he is entitled to alimony; however, monetary sanctions are distinguishable from an award of alimony for legal expenses, which may only be awarded to the disadvantaged spouse.[10] *See Foxx v. Bolden*, No. E2002-02831-COA-R3-CV, 2004 WL 256572, at *7 (Tenn. Ct. App. Feb. 12, 2004); *Turner v. Turner*, No. 01A01-9506-CV-00255, 1997 WL 136448, at *13 (Tenn. Ct. App. Mar. 27, 1997). Nevertheless, an economically disadvantaged spouse is *not* insulated from monetary sanctions when he or she engages in culpable conduct such as abuse of the discovery process. *Id.*; *see also Cummings v. Cummings*, No. M2013-00086-COA-R3-CV, 2004 WL 2346000, at *9 (Tenn. Ct. App.

___

[10]Attorney's fees in a divorce action are not awarded under a prevailing party theory. Instead, it is well-recognized in this State that an award of attorney's fees in divorce cases is typically considered alimony or spousal support, characterized as alimony in solido. *McCoy v. McCoy*, No. E2012-02698-COA-R3-CV, 2013 WL 5925900, at *7 (Tenn. Ct. App. Nov. 4, 2013) (citing *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002)); *Watson v. Watson*, 309 S.W.3d 483, 501 (Tenn. Ct. App. 2009); *see also* Tenn. Code Ann. § 36-5-121(d)(5) (2011). Because attorney's fees are often considered alimony in solido, whether to award such fees usually triggers consideration of the same factors that must be weighed in the award of any other type of alimony, including those identified in Tenn. Code Ann. § 36-5-121(i) (2011), with the most important factors being the need of the economically disadvantaged spouse and the ability of the obligor spouse to pay. *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011).

Oct. 15, 2004) (holding that monetary sanctions imposed upon an economically disadvantaged spouse for perjury were permissible).

A common discovery sanction under Rule 37.02 is a monetary award. *Mansfield*, 1995 WL 643329, at *5. A trial court's determination of the appropriate sanction for abuse of discovery process will be set aside on appeal only where the court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence. *Alexander*, 156 S.W.3d at 15.

Husband made a written request in his pre-trial brief for $186,685 in sanctions for Wife's conduct. The issue of sanctions was tried by both parties. In addition to testimony, Husband entered all of Wife's motions for contempt/sanctions and the accompanying orders into evidence. Wife, in turn, admitted all of the available hearing transcripts into evidence so the trial court would have the complete picture. Husband further submitted an attorney's affidavit as an exhibit at trial detailing in excess of $300,000 in fees incurred during the almost five years this matter was litigated.

As discussed above, the litigation of this matter was quite protracted. Wife engaged in a plethora of intentional or unintentional delay tactics by asking for at least five continuances of the trial; she was represented by seven successive attorneys in the trial court who served four sets of interrogatories, five sets of requests for production, and an amended set of interrogatories and requests for production, with the latter being quashed and the fifth request for production held in abeyance after Husband filed a motion for protective order. Husband was understandably frustrated by the changes in representation for, as could be expected, there were communication gaps as her attorneys' files repeatedly changed hands as evidenced by the April 2011 court-ordered letter regarding discovery documents which was lost in the mix for almost a year after one of Wife's attorney's withdrew.

Wife filed no less than five motions to compel, eight motions for either civil contempt or sanctions and one motion to reconsider sanctions, all of which were denied. Further, the stated purpose of obtaining the "missing" documents was for expert review. As trial approached, Wife filed at least one discovery motion per month, from January to April 2012, three of which asked for sanctions, and all of which required hearing and retread prior ground. Wife repeatedly asked for the same relief even when Husband was clearly acting in good faith in complying with the court's orders. Within weeks of trial, Wife failed to properly disclose any expert to testify regarding the some 20,000 pages of documents produced by Husband at her behest. The award of $100,000 in attorney's fees was not an award of alimony to Husband. Without dispute, the award, which represented approximately one-third of Husband's total fees, was to sanction Wife for her abuse of the discovery process.

Trial courts are afforded wide latitude over discovery matters, including discovery sanctions. *Parks*, 343 S.W.3d at 802 (citing *Brooks v United Unif. Co.*, 682 S.W.2d 913, 915 (Tenn. 1984)). As a result, we review a trial court's decision to impose sanctions and the type of sanction selected under an abuse of discretion standard. *Pegues*, 288 S.W.3d. at 353 (citations omitted). We will set aside the trial court's decision as to sanctions where the court "has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence." *Id.* at 353-354; *Buckner v. Hassell*, 44 S.W.3d 78, 83 (Tenn. Ct. App. 2000). However, we will not set aside a trial court's imposition of sanctions even though reasonable judicial minds can differ concerning their soundness. *Mercer*, 134 S.W.3d at 133 (citations omitted). Consistent with the above principles, we are not to determine "whether we would have reached the same decision" as the trial court did in awarding monetary sanctions of $100,000.

The trial court possessed the authority to impose sanctions against Wife pursuant to Rule 37 as well as under the umbrella of its "inherent powers," *id*. (citing Tenn. R. Civ. P. 37; *Lyle*, 746 S.W.2d at 698-99, and while reasonable minds can differ as to the monetary award of $100,000, we find no abuse of discretion in the award of monetary sanctions for abuse of discovery in this case.

## III. DIVISION OF THE MARITAL ESTATE

### A. CLASSIFICATION OF PROPERTY

Tennessee is a "dual property" state, recognizing both marital property and separate property; thus, property cannot be included in the marital estate unless it is deemed "marital property." *Larsen-Ball v. Ball*, 301 S.W. 3d 228, 231 (Tenn. 2010); *Smith v. Smith*, 93 S.W.3d 871, 875-76 (Tenn. Ct. App. 2002). Therefore, the division of the marital estate begins with the classification of the property as separate or marital property. *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001). Separate property is defined as "[p]roperty acquired by a spouse at any time by gift, bequest, devise or descent," Tenn. Code Ann. § 36-4-121(b)(2)(D) (2011), whereas marital property is defined as "all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing, and owned by either or both spouses as of the date of filing of a complaint for divorce," Tenn. Code Ann. § 36-4-121(b)(1)(A) (2011).

The classification of the Berg entities as marital versus separate property was a hotly contested issue at trial. Husband presented the testimony of multiple fact and expert witnesses to support his position regarding the division and valuation of marital and separate property. Significant testimony was elicited to show the Berg entities were separate property,

including testimony from Jim Osborne, the Berg entities' accountant, Wayne Weathersby, an oil and gas expert, Tom Price, an expert forensic accountant, as well as Husband's siblings, and the Berg entities' bookkeepers and employees. A certified commercial real estate appraiser, Tom McArthur, also testified as to the values of the marital residence and acreage and two Nashville rental properties. On the other hand, Wife presented no expert testimony, relying on her own estimates for valuation and lay testimony to convince the trial court that transmutation and commingling had occurred and that re-organization of the Berg entities in the 1990s from general partnerships into limited liability companies converted the business interests into marital property.

The trial court rejected Wife's argument and again questioned her credibility as a witness, ultimately classifying all of the Berg entities, family business interests inherited by Husband from his parents' estates, as separate property, valued at $6,089,004. In doing so, the court found there was no evidence of commingling or transmutation and that any appreciation in value of these entities was Husband's separate property. Wife appeals this classification on two bases, arguing again that the trial court erred in employing Husband's proposed findings of fact and conclusions of law and that her efforts to present evidence at trial regarding classification was hindered by Husband and his family's lack of cooperation and abuse of the discovery process, prompting her multiple discovery motions and requests for sanctions. As we have previously disposed of both of these issues, the trial court's classification of the parties' property is affirmed.

## B. Valuation of Property

After classifying the parties' property as either marital or separate, the trial court is charged with equitably dividing the marital assets. *Larsen-Ball*, 301 S.W. 3d at 234. Consequently, to fulfill its role of dividing the marital estate equitably, the trial court must determine the value of the property included. *Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App.1998); *Owens v. Owens*, 241 S.W. 3d 478, 486 (Tenn. Ct. App. 2007). The parties have the burden to provide competent valuation evidence. *Id*. When the evidence conflicts, the trial court may assign a value which is within the range of the values presented. *Owens*, 241 S.W. 3d at 486. Decisions regarding the value of marital property are questions of fact and we presume the trial court's factual determinations are correct unless the evidence preponderates against them. *Kinard*, 986 S.W.2d at 231.

Wife claims there was "significant proof" in the record that Husband had understated the values for "all" the property she requested, but the only property that she specifically discusses in her brief is Piedmont Gallery. We thus turn our attention to this asset.

Husband formed Piedmont Gallery in approximately 1992, a wood-working company where he was self-employed. There was no dispute that Piedmont Gallery was appropriately classified as marital property and that the business itself typically operated at a loss. Husband and Wife presented competing arguments at trial regarding the value of the business' property. Wife's testimony was very limited and based entirely on her "experience as a real estate broker." She estimated the value of the gallery's acreage and improvements as $400,000 and "guessed" that the business, if sold, would return $150,000. She offered no expert testimony in support of her valuation, did not articulate her experience, if any, with similar commercial real estate, or explain any other basis for her numbers. Wife also exhibited a summary of proposed values for all property, wherein she stated the value of the gallery was $425,000 based on its "insured value" plus $829 in the business' associated bank account. On appeal, she valued the business in her Rule 7 Table of Property and Debt as worth more than $1.75 million.

Husband presented the expert testimony of Thomas McArthur, Jr., a certified real estate appraiser with extensive experience in commercial appraisals. Mr. McArthur performed an appraisal of the property on February 27, 2012, and wrote a detailed report explaining the basis for his valuation of $225,000 using a sales comparison approach. Husband testified that there was a $190,000 mortgage on the property. He likewise exhibited his summary of property values, wherein he proposed a value of $144,180 to reflect debt associated with the property.

The trial court concluded that each party owned an undivided 50% interest in the gallery and its associated property and adopted the valuation presented by Husband of $144,180. In disregarding Wife's valuation, the trial court expressly found that she had "failed to explain any basis of her valuation, presumably relying on the insured value of the property and contents," and also failed to include any debt associated with Piedmont Gallery in her calculations.

In her brief, Wife points to Piedmont's tax returns for the years 2001 to 2007 which she now claims show Piedmont owned significant assets, took significant depreciation, obtained significant loans from owners and retained significant earnings, particularly relying on Schedule L which denotes "loans to shareholders" and "buildings and other depreciable assets." She further relies on bank records which were exhibited at trial to show that Husband made sizable loans to Piedmont in the amount of $154,400 in 2008; $110,500 in 2009; $113,100 in 2010; $157,200 in 2011; and $34,400 in early 2012.

In accepting Husband's valuation, the trial court placed a value on Piedmont which was within the range of the values presented and explained its reasoning for doing so. The trial court was presented with lay testimony from Wife without the benefit of any

substantiating evidence. Although Wife alluded to an "insured value," she did not further parse this out in her proof that we can see. Wife further did not elaborate as to how the tax returns and loans factored into her calculations nor state how the trial court's finding was deficient. From what we can discern, she appears to have cherry-picked portions of the business' tax returns for the proposition that the business owned significant assets which should commensurately inflate the value of the business. As an example, Piedmont identified $806,872 in buildings and depreciable assets and $539,380 in other assets within the 2007 tax return. However, we find that these tax returns do not cure the inadequacies of Wife's proof. We are further bemused why Wife now contends that Piedmont is worth $1.75 million, which is more than eight times what she asked for at trial.

Based on the foregoing as well as our review of the record, we find the evidence does not preponderate against the trial court's ruling that Piedmont Gallery was worth $144,180.

C. DIVISION OF MARITAL ESTATE

Wife contends the court erred in several ways in dividing the marital estate. In short, she challenges that the division was equitable; that a loan by Husband's brother while the divorce was pending constituted a marital debt; and that the trial court was mistaken in the conclusions it reached regarding dissipation of the estate.

As discussed, once the marital property has been valued, the trial court is next obliged to equitably divide it and the trial courts have wide latitude in fashioning an equitable division of marital property. *Kinard*, 986 S.W.2d at 230. Therefore, this court accords great weight to the trial court's division of marital property, *Wilson v. Moore*, 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996), and we will not disturb the decision unless it lacks proper evidentiary support, results in some error of law, or misapplies the statutory requirements. *Larsen-Ball*, 301 S.W.3d at 234. The division of the marital estate involves the distribution of both marital assets and marital debts. *Pollan v. Pollan*, No. M2011-01896-COA-R3-CV, 2012 WL 2582336, at *3 (Tenn. Ct. App. July 3, 2012) (citing *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn.2002)). "[M]arital debts are all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing." *Id.* (citing *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003)). Dividing the marital estate equitably does not require that the property be divided equally and is not formulaic, but is rather guided by the factors delineated within Tennessee Code Annotated § 36-4-121(c); *Miller*, 81 S.W.3d at 775, which are well known and need not be restated.

Dissipation of assets by a party is one of these statutory factors that is to be considered. *See* Tenn. Code Ann. § 36-4-121(c)(5) (2011). Dissipation is defined as "wasteful expenditures which reduce the marital property available for equitable distributions

and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed." *Id*. It is not a separate factor, but is "considered in the context of the marriage as a whole, and it must be weighed with all the other relevant factors in the case." *Altman v. Altman*, 181 S.W.3d 676, 682 (Tenn. Ct. App. 2005). The determination of whether dissipation of marital assets has occurred is a factual inquiry. *Lloyd v. Lloyd*, No. M2012-02240-COA-R3-CV, 2014 WL 1682004, at *5 (Tenn. Ct. App. Apr. 24, 2014) (citing *Altman*, 181 S.W.3d at 682).

The party alleging dissipation possesses the burden of persuasion and the initial burden of production. *Id*. This burden of proof "requires a showing of intentional, purposeful, and wasteful conduct." *Id*. After the party alleging dissipation establishes a prima facie case that marital funds have been dissipated, the burden then shifts to the opposing party to present evidence sufficient to show that the challenged expenditures were appropriate. *Id*.; *Pollan*, 2012 WL 2582336, at *8.

In dividing the marital property, the trial court found that dissipation had in fact occurred and relied in relevant part on the following findings of fact:

> In 1990, MEL Enterprises [one of the Berg entities owned by Husband and his siblings] obtained a $300,000 line of credit with Bancorp South in Camden, Arkansas. The line of credit was secured by the property owned by MEL. The purpose of the line of credit was to allow the owners, [Husband's brother], [Husband's sister], and Husband, to obtain funds for their personal use. Through the years, Husband and Wife increased the line of credit to the maximum amount of $300,000.

> Specifically, Husband and Wife initially made a draw on the line of credit in the amount of $165,000 which they used to pay off the remaining mortgage indebtedness on their home in Camden, Arkansas when the house was sold. Husband and Wife then borrowed an additional $90,000 to build the concrete block barn at the parties' marital residence in Franklin, Tennessee and $45,000 to pay the Internal Revenue Service. Finally, Husband borrowed $288,000 to pay Wife her $25,000 per month support award in 2009. Each year, Jim Jordan, President of Bancorp South, required Wife and Husband to sign an extension agreement for the line of credit.

> Approximately ten (10) years ago, Wife refused to sign the renewal agreement, despite the fact she had absolutely no personal liability on the line of credit. To avoid foreclosure, Mr. Jordan proposed that [Husband's brother] pledge his personal shares of Wal-mart stock as collateral for the loan [in MEL's stead].

In 2010, [Husband's brother] personally paid off the entire line of credit. In addition, since 2007, Husband was forced to borrow additional sums because he could not pay the $25,000 monthly support to Wife. Husband currently owes his brother . . . approximately $588,848 [as reflected in the exhibits].

\*\*\*

The parties have been married for 32 years, and they have three (3) adult children. Wife is 56 years old and has a college degree from Southwestern college in Economics. She has a real estate license and owns a 100% interest in the real estate company called, Land South, LLC and an interest in Delta Systems, Inc. with her paramour, Mr. McLemore. Wife made approximately $60,000 in the cabinet business in 2004 through 2005. Her health is reasonably good, except for trial-related stress. Wife has never been diagnosed with a mental illness.

Husband is 56 years old and graduated from Southwestern University with a degree in Business Administration. Approximately fifteen (15) years ago, Husband was diagnosed with diabetes. He has developed serious neurological complications in his hands and in his feet. Husband is self-employed in a wood-working business called Piedmont Gallery, Inc.

During the marriage, the parties primarily lived off distributions made to Husband from the Berg entities. Husband's adjusted gross income as reflected on his tax returns was as follows: 2000 - $295,723; 2001 - $190,396; 2002 - $267,274; 2003 - $278,076; 2004 - $545,652; 2005 - $522,644; 2006 - $412,626; 2007 - $416,149; 2008 - $574,822; 2009 - $105,001; 2010 - $757, 325. A ten (10)-year average of adjusted gross income for Husband was $436,569. A five (5)-year average for Husband was $453,185.

It is clear that the majority, if not all, of the parties' assets were acquired from the distributions made to Husband from the Berg entities. Wife contributed little to the marriage either financially or through her efforts as a homemaker; in fact, the proof showed that Wife actively dissipated the marital estate as discussed more fully below. The distributions from Husband's inherited business interests allowed him the ability to be involved in the care of the parties' three (3) adult children. He also used his separate financial resources to pay for full-time housekeepers and start a number of businesses for Wife.

However, Husband has significantly greater financial resources than Wife including separate assets valued at $6,960,923.77 as testified to by [Husband's expert forensic accountant] Mr. Price.

Based upon the foregoing, the Court divides the marital assets equally. . . but reduces Wife's share of the division of the marital estate by her proven dissipation. . .

The division of the marital assets was as follows. Husband was awarded all of the real property, the Piedmont Gallery, and various bank accounts, which total $3,779,386. Wife was awarded various bank accounts, IRA's, and household furnishings, which assets were valued at $396,349. In addition to these assets, Wife received a cash award of $1,074,099.50 to equalize the division of the marital estate. As for the marital debts, Husband was assigned the liability for almost all marital debts, which total $628,848.

The trial court also examined the competing allegations that each party dissipated marital assets. The trial court observed that Husband and Wife had filed joint federal income tax returns for the first 25 years of their marriage, but that in 2009, when Husband presented Wife with returns for the years 2003 through 2007, she refused to sign these documents. Moreover, she continued to refuse to sign these tax returns even after Husband sought judicial intervention. Following a hearing in 2011, the trial court ordered the parties to file separate income tax returns for 2008, 2009, and 2010 and notified Wife she would be liable for any additional penalties, interest, and/or increased liability incurred as a result of her refusal to file joint returns. Commensurately, Husband's expert and the parties' accountant, Mr. Osborne, testified via deposition at trial that Wife's refusal to sign the returns had increased tax liability by $90,000. The court then determined that Wife's refusal to sign the joint tax returns dissipated the marital estate by $90,000.

In considering Husband's alleged dissipation, the trial court took note of Wife's testimony that Husband had dissipated approximately $2 million in marital assets through Piedmont Gallery. Husband refuted Wife's accusations, explaining that any losses were "not intentional; that he was always trying to make a profit; but that he simply was not a good businessman." The court concluded that Wife had failed to meet her burden of proof on this issue due in part to the fact it was her word against his and, as the court again noted, she was not a credible witness. As a result, the trial court declined to find that Husband had dissipated the estate via his poor business practices in running Piedmont Gallery.

As noted above, the trial court found that Wife had dissipated $90,000 in marital assets by willfully refusing to sign tax returns, and the trial court declined to find Husband had dissipated the estate largely due to his testimony. Both of these decisions were based in

part on the court's finding that Wife was not a credible witness. Witness credibility is a matter peculiarly within the sovereign realm of the trial court, *see Bowman v. Bowman*, 836 S.W.2d 563, 567 (Tenn. Ct. App. 1991)., and we accord great weight to findings which are dependent upon the credibility of the witnesses. *Sisk v. Valley Forge Ins. Co.*, 640 S.W.2d 844, 849 (Tenn. Ct. App. 1982) (citations omitted). We have, therefore, concluded that the evidence does not preponderate against these findings.

Furthermore, the evidence does not preponderate against the trial court's findings as to the value of the respective marital assets that comprise the marital estate for these findings are supported by the testimony of several credible witnesses and the only contradictory values were based solely on Wife's testimony, which the court found lacking. Moreover, the evidence does not preponderate against the court's finding that the debt owed to Husband's brother, in the amount of $588,848, was a valid marital debt, which was assigned to Husband. Calculating all of the above, Husband was awarded 55% of the entire marital estate and Wife 45%.

Considering all of the above, we find the division of the marital estate is supported by the evidence, that the trial court properly applied the statutory requirements, and the result is equitable to both spouses. Accordingly, we affirm the trial court on these issues.

### IV. ALIMONY

Wife contends the award of alimony was insufficient.[11]

Wife initially received $5,000 per month in *pendente lite* support, which generally derived from rental income from commercial properties Husband and Wife owned in Franklin, Tennessee. In May 2009, her support was significantly increased to $25,000 per month, which was deposited into an escrow account to be utilized by Wife as family support for her and their one minor child.[12] The rental income was concomitantly switched over to Husband, and Wife continued to receive this amount up until the summer of 2011. After Wife's sixth attorney withdrew, the trial court gave Wife the option to either proceed with trial or continue the July 2011 setting with a reduction in monthly support. Wife chose the latter, and her support was reduced to $15,000 per month effective August 1, 2011, which remained the status quo until trial.

---

[11]Husband does not oppose the type, length or amount of alimony awarded to Wife; therefore, our review of the alimony award will be limited to Wife's contentions.

[12]Immediately prior to trial, the parties' youngest son reached the age of majority.

The trial court determined that since the year 2000, Husband's total gross income never exceeded $757,325, that his five-year average income was $453,185, and that Wife had a history of good health and earning capacity of $60,000 per year. The trial court found that Wife had misrepresented her monthly expenses and accepted no blame for the demise of the marriage, even though she was at fault and had a lengthy relationship with her paramour. The foregoing notwithstanding, the court ultimately concluded she was entitled to rehabilitative alimony of $8,000 per month to terminate in ten years, at which time she notably qualified for Social Security benefits.

We begin our analysis of this issue by observing that Wife put forth little effort in briefing this issue.[13] She offered rote citation to the statutes governing alimony and then stated the following in purported support of reversal:

> The court failed to make findings to show that rehabilitative alimony is appropriate or otherwise addressing . . . [Wife's] need. The court copied what Husband asked for, but with a slight increase. However, he [sic] amount is significantly less than what was necessary to maintain the marital lifestyle and significantly less that [sic] Husband's resources. Husband was not even required to maintain a life insurance policy to secure the alimony payment.
>
> Statement after statement in Husband's proposed findings copied/adopted by the trial are erroneous or are missing the "rest of the story." The errors already referred to in the findings are clear. Continuing to point out the errors only serves to distract and cloud the matters that need to be addressed. The abuse of discretion is clear and warrants the setting aside of the court's entire ruling.

Trial courts are afforded wide discretion in determining whether there is a need for spousal support, and if so, the nature, amount, and duration of the award. *Gonsewski*, 350 S.W.3d at 105. When determining whether to award alimony and the "nature, amount, length, and manner of payments," courts are required to consider the factors set forth at Tenn. Code Ann. § 36-5-121(i), which includes the standard of living established by the parties during the marriage. *Id.* at 110; *see also Mayfield*, 395 S.W.3d at 115-16. However, the two most important factors to consider are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Id.*; *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn.1995).

---

[13]Where a party makes no legal argument and cites no authority in support of a position, such issue is deemed to be waived and will not be considered on appeal. *Emrich*, 2013 WL 1200250, at *8. Although the citation of authority in Wife's brief is minimal at best, we have chosen to address the issue.

On appeal, this court may not substitute its judgment for that of the trial court; rather, it should presume that the trial court's alimony decision is correct and review the evidence in the light most favorable to that decision. *Gonsewski*, 350 S.W.3d at 105. The deference given to trial court decisions regarding spousal support follows from the recognition that such decisions are "factually driven" and involve "the careful balancing of many factors." *Id*. (citing *Kinard*, 986 S.W.2d at 235). We review awards of alimony under an abuse of discretion standard, and a trial court abuses its discretion only when its ruling "causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Id*.

Contrary to "clouding" the issues, it would illuminate this court for Wife to fill in "the rest of the story," explain her position, and identify related authority. We recognize that the $8,000 in alimony is significantly less than the $25,000 per month in *pendente lite* support Wife received for over two years. However, this one fact, standing alone, is not sufficient for us to conclude that the alimony award is improper, particularly when this amount originally included support of the parties' minor son who is now an adult.

Wife also complains that the trial court did not order Husband to maintain a life insurance policy. Tennessee Code Annotated § 36-5-121(k) provides that, to secure an alimony obligation, the court *may* order a party to maintain a life insurance policy with the other party as the beneficiary. As we noted earlier, the trial court has broad discretion, and we will not second-guess its decision regarding spousal support when it has obviously weighed the statutory factors. We are also mindful of the fact that Husband has significant health issues due to diabetes and neuropathy, which was considered by the trial court when deciding not to require life insurance.

The award of alimony to Wife is accordingly affirmed.

### V. WIFE'S INCOME

Wife claims the trial court erred by finding she had an earning capacity of at least $60,000 a year; however, she does not explain why the court should not have considered that she had three million-dollar real estate listings at the time of trial or that she owned an interest in both of her paramour's businesses, Delta Systems, Inc. and the Bison Group. Although she testified that her earning capacity was minimal, once again, the court expressly noted that she was not a credible witness. To the extent she believes the court's finding as to her earning capacity would have modified the manner in which the trial court weighed the factors in dividing the marital estate or in awarding alimony, we are not persuaded

-29-

particularly in light of the deferential standard of review as to these issues. We therefore affirm.

## VI. GROUNDS FOR DIVORCE

The trial court granted Husband the divorce on the grounds of Wife's adultery and inappropriate marital conduct under Tenn. Code Ann. §§ 36-4-101(3) and 36-4-101(11). Wife contends the trial court should have declared the parties divorced under Tenn. Code Ann. § 36-4-129(b) rather then awarding the divorce to Husband alone, because the grounds for divorce were acknowledged prior to trial and Husband admitted to adultery.

When the grounds for divorce are appealed by a party, our standard of review is de novo on the record with a presumption of correctness. *Hobbs v. Hobbs*, 987 S.W.2d 844, 846 (Tenn. Ct. App. 1998). Accordingly, we will not disturb the trial court's findings absent a showing that the findings are contrary to the preponderance of the evidence. *Id*.

Tenn. Code Ann. § 36-4-129(b) (2008) provides that:

The court may, upon stipulation to or proof of any ground of divorce pursuant to § 36-4-101, grant a divorce to the party who was less at fault or, if either or both parties are entitled to a divorce or if a divorce is to be granted on the grounds of irreconcilable differences, declare the parties to be divorced, rather than awarding a divorce to either party alone.

Commensurately, the trial court holds the discretion to grant a divorce to the party who was less at fault. *See Miller v. Miller*, No. E2010-00492-COA-R3-CV, 2010 WL 4483967, at *3 (Tenn. Ct. App. Nov. 9, 2010).

Our courts have long recognized that a pattern of misconduct may constitute inappropriate marital conduct as a ground for divorce. *Burkhart v. Burkhart*, No. M1999-02332-COA-R3-CV, 2000 WL 1231371, at *4 (Tenn. Ct. App. Aug. 31, 2000). Husband's proof via his own testimony as well as various fact witnesses was that Wife's behavior was so inappropriate that it constituted a ground for divorce. The trial court agreed as is evident from its summary of the evidence, the gist of which reflects that Wife engaged in an angry, critical, verbally abusive, and sometimes violent pattern of behavior toward Husband throughout their marriage.

Moreover, Wife's adulterous affair with her real estate colleague was the catalyst for Husband filing for a divorce and the adulterous relationship continued throughout the five years the divorce was pending. Although Wife asserts that neither her affair nor her actions

contributed to the demise of her marriage, the trial court disagreed and the evidence does not preponderate against the trial court's findings on the grounds for divorce.

## VII. ATTORNEY'S FEES

Husband seeks to recover the attorney's fees incurred on appeal. Whether to award attorney's fees on appeal is a matter within the sole discretion of this court. *Wheeler v. Wheeler*, No. M2012-02154-COA-R3-CV, 2014 WL 1512828, at *20 (Tenn. Ct. App. Apr. 15, 2014) (citing *Hill v. Hill*, No. M2006-02753-COA-R3-CV, 2007 WL 4404097, at *6 (Tenn. Ct. App. Dec. 17, 2007)). In determining whether an award is appropriate, we take into consideration "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered." *Id*. After weighing these factors, we exercise our discretion to respectfully deny his request.

## IN CONCLUSION

The judgment of the trial court is affirmed and this matter is remanded with costs of appeal assessed against the appellant, Julie Ann Rutledge Berg.

_____
FRANK G. CLEMENT, JR., JUDGE